## AFFIDAVIT OF SPECIAL AGENT JAMIE P. VITALE
### (FILED UNDER SEAL)

I, Jamie P. Vitale, being duly sworn, do hereby depose and state under oath as follows:

### Introduction

1. I am a Police Officer with the Massachusetts State Police and have been so employed for approximately 10 years. From July of 1998 through November of 2003, I was assigned to the Massachusetts State Police Special Tactical Operations Team. I have been assigned to the Drug Enforcement Administration High Intensity Drug Trafficking Area Task Force as a Deputized Task Force Agent since April 2003.

2. I have attended and graduated from the Massachusetts State Police Academy. I have received specialized narcotics training from the Massachusetts State Police. I have completed an 80-hour Narcotics Investigators Course presented by the Drug Enforcement Administration in October 1995. I have completed training at a Proactive Criminal Enforcement Seminar focusing on interstate narcotics trafficking and the detection of after market motor vehicle compartments in July 2000 and Task Force Officer Orientation Training School presented by the Drug Enforcement Administration in August 2003.

3. During my career I have been involved in many narcotic-related arrests and assisted in the execution of numerous narcotic-related search warrants. I have seized and examined narcotics including cocaine, crack cocaine, heroin, tar heroin, marijuana, hashish, ecstasy, LSD and various prescription narcotics. I have been trained in and conducted basic field-testing of illegal narcotics. I have conducted physical and electronic surveillance of drug distributors. I have debriefed and worked with confidential informants and cooperating witnesses who have been involved in the use and distribution of controlled substances. I have conducted or participated in the introduction of undercover agents, undercover transactions and reviews of taped conversation and drug records. I have acted in an undercover capacity and purchased various amounts of cocaine, crack cocaine and heroin. Through my education, training and experience, I have become familiar

1

with the manner in which illegal drugs are imported, transported, stored, and distributed; the practices and procedures commonly employed by narcotics traffickers to conduct their business, including the use of telephones, cellular phones, and pagers; the method of payment for such drugs; and some of the methods that are used to disguise the source and nature of the profits made by narcotics traffickers.

4.    Specifically, I am familiar with the manner in which narcotics traffickers use vehicles, common carriers, mail and private delivery services and a variety of other means to transport and distribute narcotics and the proceeds of narcotics trafficking. I also am familiar with the manner in which narcotics traffickers use telephones, coded or slang-filled telephone conversations, pagers, coded pager messages, and other means to facilitate their illegal activities.

### This Case

5.    I have personally participated in the investigation of the Target Subjects identified in this Affidavit since in or about December 2003. I am familiar with the facts and circumstances of this investigation based upon oral and written reports made to me by other Agents of the DEA, other federal, state and local law enforcement agencies, oral and written reports of conversations and meetings with numerous confidential sources, a review of consensually recorded conversations, and a review of line sheets of conversations intercepted pursuant to court-ordered wiretaps as well as my own personal participation in the investigation which includes surveillance and independent investigation.

6.    I submit this affidavit in support of an application for a criminal complaint regarding the following individuals:

> **RIGOBERTO MORFIN-RODRIGUEZ, a/k/a "RIGO";**
>
> **GILBERTO MORFIN-RODRIGUEZ, a/k/a "GIL";**
>
> **JUAN M. VARGAS, a/k/a "JUANITO";**
>
> **JOSE NOEL VICTORIA JR., a/k/a "PEPE MONIKER," "EL GORDO";**
>
> **MIGUEL ARTEAGA, a/k/a "EL CHUECO";**

2

TEODORO CARDENAS, a/k/a "TEODORO";

JOSE GALLARDO CARDENAS, a/k/a "PEPE";

GUADALUPE JUAN RAMOS ARTEAGA;

OCTAVIANO VARGAS BARAJAS, a/k/a "TAVO";

JERRY T. HUNTER a/k/a "EL NEGRO";

KERRY FELKER;

JESUS MENDOZA, a/k/a "CHUY";  and

GEOVANE ROJAS  (collectively, "Target Subjects") charging each of them with conspiring with each other and other known and unknown persons to possess with intent to distribute and to distribute cocaine, a Schedule II controlled substance, and marijuana, a Schedule I controlled substance, in violation of 21 U.S.C. §§ 846, 841(a)(1).

7.     I also submit this affidavit in support of an application for the issuance of search warrants to be executed at the premises listed in this paragraph (collectively, "the Target Locations") and as further described in **Attachments A** to the search warrants:

(a)    615 Willard Street, Leominster, Massachusetts as more fully described below and in Attachment A-1 hereto;

(b)    45 Stephens Road, Leominster, Massachusetts as more fully described below and in Attachment A-2 hereto; and

(c)    62 Frankfurt Street, Fitchburg, MA as more fully described below and in Attachment A-3;

(d)    341 Union Street, Leominster, 2nd Floor and Garage, MA as more fully described below and in Attachment A-4 hereto; and

(e)    30 North Main Parkway, Apartment 1 West, Leominster, Massachusetts as more fully described below and in Attachment A-5.

for evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §§846, 841(a)(1) as described more fully in **Attachments B** to the search warrants.

3

8.     This affidavit includes a summary of events that I am personally familiar with as well as information related to me by other law enforcement personnel who have been working on this investigation. This affidavit does not set forth all the facts developed during the course of this investigation. Rather, it sets forth only those facts that are necessary and sufficient to establish the requisite foundation for issuance of a criminal complaint against the Target Subjects and the issuance of search warrants for the Target Locations.

<u>**Overview of Investigation**</u>

9.     As more fully set forth below, evidence gathered to date in this investigation reveals that the Target Subjects are involved in a conspiracy to possess with intent to distribute and to distribute marijuana and cocaine. This investigation has involved information including but not limited to information received from confidential informants, purchases of cocaine by a confidential informant, telephone calls intercepted by and/or between the Target Subjects pursuant to court-authorized wiretaps on 347-235-1998, International Mobile Subscriber Identity ("IMSI") number 316010101338154 and urban fleet mobile identifier ("UMFI")[1] Number 183*133*9951, which is a Nextel Communications cellular telephone subscribed to Jose Terrarez, 3670 Barnes Avenue, Bronx, New York ("Target Telephone 1"), 347-235-1996, International Mobile Subscriber Identity (IMSI) number 316010101338135 and UMFI Number 183*133*9932, which is a Nextel Communications cellular telephone subscribed to Jose Terrarez, 3670 Barnes Avenue, Bronx, New York ("Target Telephone 2"), a cellular telephone currently assigned telephone number 310-270-1179, IMSI number 316010100292802 and UMFI number 126*962*1770, which is a Nextel Communications cellular telephone subscribed to Phil Jacks, 401 W A Street, San Diego, California ("Target Telephone 3")[2] and the cellular telephone currently assigned telephone number 978-788-

---

[1]The Target Telephones have a removable computer chip that is encoded with an IMSI number. The chip may be inserted into similarly equipped telephones and used to operate those phones. The IMSI number is unique to a subscriber. In addition, the UFMI number allows Nextel telephones to contact other Nextel users directly via the "direct connect" feature.

[2]Although Target Telephone 1 and 2 have New York area codes (and Target Telephone 3 has a California area code), physical surveillance and cell site information has confirmed that the

3025, IMSI number 316010102250544 and UMFI Number 183*914*50, which is a Nextel Communications cellular telephone subscribed to Donny Do, 379 Main Street, Fitchburg, Massachusetts ("Target Telephone 4") (collectively, "the Target Telephones"), physical surveillance, and review of subscriber information, pen register data and toll records relating to phones used by the Target Subjects and/or their associates.

## A. TARGET SUBJECTS

### 1. RIGOBERTO MORFIN-RODRIGUEZ, a/k/a "RIGO" ("RIGOBERTO")

10.     RIGOBERTO is a 40 year-old Mexican born male who resides at 615 Willard Street, Leominster, Massachusetts, one of the Target Locations. He is the user of Target Telephone 2. Based upon the investigation to date, he is the leader of a violent drug trafficking organization based primarily in northern Worcester County that distributes large quantities of marijuana and cocaine to customers throughout New England ("Morfin DTO"). Based upon confidential informant information, RIGOBERTO is believed to have participated in the murder of his nephew, Raphael Morfin, in May 2003 in Templeton, Massachusetts.[3] (RIGOBERTO has been intercepted in several calls with different individuals regarding this murder. He has not implicated himself in this crime to date in these calls, but the callers have indicated that they and others believed that he was involved).  During the wiretap investigation, surveillance has observed him meeting with drug customers and members of the Morfin DTO. As described in more detail below, RIGOBERTO and other members of the Morfin DTO, were involved in (and intercepted in discussions about) arranging the transport of approximately 355 pounds of marijuana from Arizona to Massachusetts that was intercepted in Nevada on November 6, 2004. Also as described in more detail below, RIGOBERTO and other members of the Morfin DTO were involved in (and intercepted in discussions about)

---

Target Telephones were or are predominately used in Massachusetts.  Based upon interceptions to date, Target Telephones 1 and 3 were used GILBERTO; Target Telephone 2 is used by RIGOBERTO and Target Telephone 4 is used by GILBERTO.

[3]This murder is being investigated by Massachusetts State Police Detective Unit, Worcester County.  No suspects have been arrested to date in this investigation.

arranging the transport of approximately $209,000 from Massachusetts to Arizona as payment for marijuana that was intercepted in New York on December 30, 2004. Most recently, RIGOBERTO was intercepted in discussions relating to the shipment of a large quantity of marijuana that was seized during a car stop on March 2, 2005 and during the execution of a state search warrant on 82 Ashburnham State Road, Westminster, MA on March 3, 2005.

### 2.    GILBERTO MORFIN-RODRIGUEZ, a/k/a "GILL" ("GILBERTO")

11.    GILBERTO is a 26 year-old Mexican born male who resides at 45 Stephens Road, Leominster, Massachusetts, one of the Target Locations. He was the user of Target Telephone 1 and Target Telephone 3 and is the user of Target Telephone 4. GILBERTO is the nephew of RIGOBERTO and works closely with him in directing the Morfin DTO. In addition to having been intercepted in regard to the November 6, 2004, December 30, 2004 and March 2005 seizures referenced above, GILBERTO has also been intercepted via the Target Telephones arranging to distribute marijuana to Target Subject JERRY HUNTER for a customer of HUNTER's, Target Subject KERRY FELKER. On January 7, 2005, FELKER's vehicle was stopped in Massachusetts and over $69,000 in cash was found in the trunk of his vehicle that is believed to have been (partial) payment to the Morfin DTO for several hundred pounds of marijuana. On January 14 and 15, 2005, GILBERTO was again intercepted arranging to have marijuana delivered at HUNTER's request for FELKER by Target Subject JOSE CARDENAS. Subsequent surveillance on January 15th revealed that JOSE CARDENAS made delivery to FELKER. Later that day, approximately 100 pounds of marijuana was seized from a vehicle driven by FELKER's brother (but that had been used by FELKER during the meet with JOSE CARDENAS) during a car stop in New Hampshire.

### 3.    JUAN M. VARGAS, a/k/a "JUANITO" ("JUANITO")

12.    JUANITO is a 24 year-old male who is believed to reside in Tucson, Arizona. Based upon interceptions and surveillance to date, JUANITO is responsible for coordinating the transport of drugs and drug proceeds to and from Massachusetts and Arizona for GILBERTO and RIGOBERTO. For example, intercepted calls between JUANITO and GILBERTO and

6

RIGOBERTO on Target Telephones 2 and 3 reveal that JUANITO was responsible for arranging the transport of $209,000 (for payment for marijuana) from Massachusetts to Arizona that was intercepted by law enforcement in New York on December 30, 2004. For this transport of money, JUANITO arranged for his brother, OCTAVIANO, to be involved in the transport. For the transport of the 355 pounds of marijuana on November 6th mentioned above, JUANITO, the owner of J&B Trucking based in Yakima, Washington, was the registered owner of the tractor trailer that was used for this transport. Recent interceptions between JUANITO and GILBERTO reveal that JUANITO has traveled back to Massachusetts with OCTAVIANO to arrange the transport of what is believed to be the transport of marijuana and/or money to pay for marijuana for the Morfin DTO. 615 Willard Street, one of the Target Locations and RIGOBERTO's residence, is in JUANITO's name.

### 4.    JOSE NOEL VICTORIA JR., a/k/a "PEPE MONIKER," "EL GORDO" ("VICTORIA")

13.    JOSE VICTORIA is a 24 year-old male, born in California, who is believed to reside in West Covina, California. As described in more detail below, JOSE VICTORIA was arrested on November 6, 2004 in connection with the seizure of approximately 355 pounds of marijuana that he was transporting from Arizona to Massachusetts for the Morfin DTO. Surveillance has also observed VICTORIA meeting with RIGOBERTO, GILBERTO and other members of the Morfin DTO. He is currently out on bail on the drug charges and continues to be intercepted via the ongoing interceptions of Target Telephones 2 and 4.

### 5.    MIGUEL ARTEAGA, a/k/a "EL CHUECO"

14.    MIGUEL ARTEAGA is a 32 year-old Mexican born male who is believed to have previously resided at 62 Frankfort Street, Fitchburg, Massachusetts, one of the Target Locations. MIGUEL ARTEAGA has been intercepted in conversations with both RIGOBERTO and GILBERTO throughout this investigation. As described in further detail below, MIGUEL ARTEAGA was a close associate and member of the Morfin DTO until he fled the area on or about January 19, 2005. He has been observed throughout this investigation meeting and traveling with

7

members of the Morfin DTO, including GILBERTO and RIGOBERTO, on multiple occasions. MIGUEL ARTEAGA, who owns ARTEAGA Brothers Transportation based in Washington State, has had his vehicles used to transport narcotics to and for the Morfin DTO. Interceptions on or about January 18 and 19, 2005 indicated that GILBERTO and RIGOBERTO believed that MIGUEL ARTEAGA had been involved in the law enforcement interdiction on November 6th and December 30th of drugs and money and that he and his brother (Target Subject JUAN ARTEAGA) had been distributing drugs on their own.    Agents believe that upon learning of GILBERTO's and RIGOBERTO's belief, MIGUEL ARTEAGA left Massachusetts. At some subsequent point, he returned to Massachusetts because, as discussed in further detail below, on March 3, 2005, he was one of the individuals arrested at 82 Ashburnham State Road, Westminster, Massachusetts when law enforcement officers seized approximately 531 pounds of marijuana. At the time of his arrest at 82 Ashburnham State Road, MIGUEL ARTEAGA had one loaded firearm under his mattress and a second firearm in a dresser in the same room. MIGUEL ARTEAGA is currently in Massachusetts state custody on charges relating to this arrest.

**6.    TEODORO CARDENAS, a/k/a "TEODORO" ("TEODORO")**

15.    TEODORO is a 49 year-old male who, along with Target Subject JOSE CARDENAS, currently resides at and uses 341 Union Street, Leominster, Massachusetts and 62 Frankfort Street, Fitchburg, Massachusetts, both Target Locations. Based upon information obtained from the interception of the Target Telephones and surveillance, TEODORO distributes narcotics to and collects drug proceeds from customers of the Morfin DTO at the direction of GILBERTO.

**7.    JOSE GALLARDO CARDENAS, a/k/a "PEPE"**

16.    JOSE CARDENAS is a 33 year-old male who is also believed to reside at and use 341 Union Street, Leominster, Massachusetts and 62 Frankfort Street, Fitchburg, along with TEODORO. JOSE CARDENAS is the nephew of TEODORO. Based upon interception of the Target Telephones and physical surveillance, JOSE CARDENAS distributes narcotics to and collects

drug proceeds from customers for GILBERTO and otherwise assists the drug distribution activities of the Morfin DTO. For example, JOSE CARDENAS was involved in packaging $209,000 into a tire that was seized during the December 30th vehicle stop.

### 8. GUADALUPE JUAN RAMOS ARTEAGA

17.    JUAN ARTEAGA is a 29 year-old male. He is the brother of MIGUEL ARTEAGA. As discussed in further detail below, he was arrested on March 3, 2005 at 82 Ashburnham State Road, Westminster, Massachusetts, along with MIGUEL ARTEAGA and three other individuals when approximately 531 pounds of marijuana was seized there. He is currently in Massachusetts state custody on charges relating to this arrest.

### 9.    OCTAVIANO VARGAS BARAJAS, a/k/a "TAVO" ("OCTAVIANO")

18.    OCTAVIANO is a 35 year-old male, who resides in Tucson, Arizona. He is the brother of JUANITO. Interceptions and surveillance preceding the December 30th money seizure revealed that he was involved in the arrangements to package and transport this money to Arizona as payment for marijuana. He, along with Yesenia Rodriguez-Sahagun and Luz Maria Valencia, traveled in the vehicle from Massachusetts to Arizona from which law enforcement in New York seized $209,000 on December 30, 2004. OCTAVIANO was intercepted on Target Telephone 3 after that stop talking with GILBERTO about the fact that they had been stopped by law enforcement officers. Recent interceptions indicate that JUANITO and OCTAVIANO may soon be traveling to transport drugs and/or money for drugs for the Morfin DTO.

### 10.    JERRY T. HUNTER a/k/a "EL NEGRO" ("HUNTER")

19.    JERRY HUNTER is a 26 year-old black male who resides at 30 North Main Parkway, Apartment 1 West, Leominster, Massachusetts, one of the Target Locations. Based on interceptions over the Target Telephones between HUNTER and GILBERTO, HUNTER purchases marijuana and cocaine from the Morfin DTO. For example, in January 2005, there were intercepted calls between HUNTER and GILBERTO about HUNTER purchasing marijuana to distribute to a

third party (later identified as FELKER). Based upon the interceptions, this quantity of marijuana was fronted to HUNTER and his customer, FELKER, and HUNTER and FELKER paid for it in installments. On January 7, 2005, FELKER was stopped by law enforcement agents as he drove from Maine to Massachusetts in an attempt to deliver one of these installments to the Morfin DTO. Over $69,000 in cash was seized from FELKER's vehicle at that time. Later that month, on January 15, 2005, approximately 100 pounds of marijuana were seized from FELKER's vehicle (driven by FELKER's brother) after HUNTER had arranged through GILBERTO to have delivery of marijuana made to FELKER. Based upon interceptions between HUNTER and GILBERTO, it is also believed that HUNTER purchases cocaine from the Morfin DTO.

### 11.    KERRY FELKER ("FELKER")

20.    KERRY FELKER is a 44 year-old male. He resides in Lewiston, Maine. FELKER is a marijuana customer of HUNTER's. To date, he has not been intercepted on any of the Target Telephones. As mentioned above and discussed below in more detail, law enforcement officers seized over $69,000 in suspected drug proceeds from FELKER on January 7, 2005. Law enforcement officers also seized approximately 100 pounds of marijuana (on January 15, 2005) and approximately 48 pounds of marijuana (on January 29, 2005) from associates of FELKER's (including his brother, Ralph Felker) after he had given marijuana to them that he had purchased through HUNTER from the Morfin DTO.

### 12.    JESUS MENDOZA, a/k/a "CHUY" ("MENDOZA")

21.    JESUS MENDOZA is a 31 year-old male who resides at 47 Longwood Avenue, Apartment 3, Fitchburg, Massachusetts. Prior to the interceptions of any of the Target Telephones, a confidential source ("CS3") made four controlled purchases of cocaine from MENDOZA in July, August, September and October 2004. Based upon interceptions to date on the Target Telephones and related surveillance, MENDOZA purchases large amounts of cocaine and marijuana from GILBERTO and distributes them to customers.

10

### 13. GEOVANE ROJAS ("ROJAS")

22.     GEOVANE ROJAS is a 22 year-old male born in California. Based upon
interceptions between ROJAS and GILBERTO (and then GILBERTO and TEODORO) over Target
Telephone 3 on January 25, 2005 and February 8, 2005 (and related surveillance of ROJAS and
TEODORO on January 25th), there is probable cause to believe that ROJAS ordered cocaine from
GILBERTO, GILBERTO arranged to have it delivered by TEODORO and TEODORO delivered
it to ROJAS.

### B. TARGET LOCATIONS

#### 1. 615 Willard Street, Leominster, Massachusetts
#### Description of premises (Attachment A-1)

23.     615 Willard Street in Leominster is a tan-colored, wood-framed two story
residence with green shutters. It is located at the corner of Willard Street and Harbor Light Estates.
The numbers 615 are affixed to a mailbox located at the end of the driveway. The front door of the
residence is tan in color with a green storm door and faces Willard Street. It is accessed from a porch
attached to the front of the residence which is reached by climbing a set of wooden stairs attached
to the right side of the porch. A tan colored, wood-framed, multi-bay detached garage with green
doors and shutters is positioned at the end of the driveway and adjacent to the rear of the residence.
(A photograph of 615 Willard Street, Leominster, Massachusetts is attached to Attachment A-1).

24.     Although information from National Grid indicates that the subscriber for this
location is Juan M. Vargas (a/k/a JUANITO) with a listed contact number of 509-307-8755,
RIGOBERTO resides at this location. There is probable cause to believe that RIGOBERTO's
residence is a location where members of the Morfin DTO meet to discuss narcotics-related business
and a location that it used to stash narcotics proceeds and materials related to the drug trafficking
business. For example, on December 19, 2004, surveillance agents observed several members of
the Morfin DTO unload a spare tire and rim and bring it into RIGOBERTO's residence during the

11

time that RIGOBERTO, GILBERTO and others were having intercepted, coded calls about arranging to transport money for marijuana from Massachusetts to Arizona and arranging to load the tire with money for that purpose. (The tire was later moved to 341 Union Street and then finally was stashed at GILBERTO's residence at 45 Stephens Road). Based upon intercepted calls and physical surveillance, the December 30, 2004 motor vehicle stop that resulted in the seizure of $209,000 in suspected drug proceeds from a spare tire was the money that had been loaded in the tire by the Morfin DTO. Agents have also observed tractor trailer units parked in the driveway of RIGOBERTO's residence on several occasions. Based upon intercepted calls and physical surveillance, I believe that on December 15-16, 2004, members of the Morfin DTO unloaded a shipment of narcotics from a tractor trailer unit there.

## 2.    45 Stephens Road, Leominster, Massachusetts
### Description of premises (Attachment A-2)

25. 45 Stephens Road in Leominster is a white-colored, wood-framed one story residence with pale red shutters. The numbers 45 are black and affixed to the left of the front door. The front door of the residence is off-white in color with a white storm door and faces Stephens Road. It is accessed by climbing a set of concrete steps attached to the front of the residence. A wood frame open carport is attached to the left side of the residence. There is access to the residence from the carport via a side door atop a set of concrete steps. There are several small sheds and a portable garage located in the back yard of the residence adjacent to the in-ground pool. (A photograph of 45 Stephens Road, Leominster, Massachusetts is attached to Attachment A-2).

26. Information from National Grid indicates that the subscriber for this location is Beronica Rodriguez (believed to be GILBERTO's wife) with a contact telephone number of 978-534-5320. GILBERTO resides at this location. Based upon intercepted calls and surveillance, GILBERTO has traveled from the 45 Stephens Road location on numerous occasions to meet with drug customers and, on numerous occasions, has returned to this location after meeting with drug customers. There is probable cause to believe that GILBERTO's residence is a location where

12

members of the Morfin DTO meet to discuss narcotics related business. There is also probable cause to believe that GILBERTO's residence is believed to be a location the Morfin DTO uses to stash narcotics proceeds. For example, on December 20, 2004, surveillance agents observed TEODORO and JOSE CARDENAS unload a spare tire and rim and bring it into GILBERTO's residence. Based upon intercepted calls and physical surveillance and the December 30, 2004 interdiction of $209,000, I believe the spare tire stashed at GILBERTO's residence contained narcotics proceeds.

### 3.  62 Frankfurt Street, Fitchburg, MA

**Description of premises** (Attachment A-3)

27. 62 Frankfort Street in Fitchburg, Massachusetts is a blue-colored, wood framed two story residence with white shutters. The numbers 62 are affixed to a mail box, attached to a chain linked fence gate in front of the residence. The front door is white in color with a white storm door and faces Frankfort Street. It is accessed by climbing two sets of concrete steps at the end of a short walkway. (A photograph of 62 Frankfurt Street, Fitchburg, MA is attached to Attachment A-3).

28. A review of a database of public records revealed that this location is owned by George Pergantis (as of November 2002).[4] Earlier in this investigation, Target Subjects MIGUEL ARTEAGA and JUAN ARTEAGA resided at 62 Frankfort Street based upon surveillance and related intercepted calls. On January 18, 2005, RIGOBERTO and GILBERTO discussed the fact that VICTORIA had received information that it was MIGUEL ARTEAGA's fault that the November 6, 2004 and December 30, 2004 seizures of marijuana and money, respectively, occurred (i.e. that ARTEAGA had provided information to law enforcement about these matters). The following morning, January 19th, surveillance observed vehicles registered to JOSE CARDENAS and RIGOBERTO arrive at 62 Frankfort Street and observed RIGOBERTO and GILBERTO enter the residence. (A vehicle registered to MIGUEL ARTEAGA was observed there at the time). In

---

[4]Surveillance agents have reviewed a Registry of Motor Vehicles photograph of Pergantis and he has not been observed at the 62 Frankfort Street location during the course of this investigation.

subsequent intercepted conversations, RIGOBERTO told JUANITO that things are all screwed up because these guys (meaning the ARTEAGAS) were receiving things on their own (meaning that the ARTEAGA were distributing drugs on their own) and we (meaning RIGOBERTO, GILBERTO and their associates) had to tell it like it is and they were going to wait to see what happened. During this conversation JUANITO indicated that MIGUEL ARTEAGA was headed to Mexico. RIGOBERTO indicated that he got really rough with them and that he would have to kill them if they don't want to listen. RIGOBERTO indicated that Juan (ARTEAGA) was crying and denied the whole thing. (Based upon this intercepted call and the prior surveillance of RIGOBERTO and GILBERTO at 62 Frankfort Street, agents believe that they and/or their associates may have beaten JUAN ARTEAGA). There is probable cause to believe that MIGUEL ARTEAGA fled the area at or about this time, but, as aforementioned, returned to Massachusetts sometime before his March 3, 2005 arrest at 82 Ashburnham State Road. JUAN ARTEAGA remained in Massachusetts and continued to work for the Morfin DTO.

29.    Since at or about that time, TEODORO and JOSE CARDENAS have resided at and used the 62 Frankfort Street location. A trash pull at 62 Frankfort Street on January 19, 2005 revealed a money order receipt. The sender's name on the receipt was listed as Tomas Cordova Chavez, 45 Stephens Road, Leominster (a name used by TEODORO); the recipient's name was listed as Carolina Morfin Rodriguez (TEODORO's ex-wife). Based upon the trash pull and subsequent surveillance, TEODORO is now using this location (along with his brother, JOSE CARDENAS) as a residence and stash location for drugs and drug proceeds. Although the individuals primarily using this location have changed from the ARTEAGA brothers to JOSE and TEODORO CARDENAS, the use of the 62 Frankfurt Street location has remained constant. That is, this location continues to be used as stash location for drugs and drug proceeds by the Morfin DTO.

30.    Based upon intercepted calls over the Target Telephones and surveillance, several members of the Morfin DTO, including GILBERTO, TEODORO, JOSE CARDENAS and JUAN ARTEAGA have traveled from the 62 Frankfurt Street, Fitchburg, Massachusetts location

14

on numerous occasions to meet with drug customers and, on numerous occasions, had returned to this location after meeting with drug customers.

### 4.    341 Union Street, 2nd Floor and Garage, Leominster, MA
### Description of Premises (Attachment A-4)

31.    341 Union Street, 2nd Floor in Leominster, Massachusetts is a white-colored, wood framed multi-family, two story residence. It is located at the corner of Union Street and Avon Street in Leominster, Massachusetts. There is a single set of purple shutters on the window at the bottom of an exterior staircase which is located on the left side of the residence. The second floor door is white in color with a storm door. It can be accessed by climbing a set of wooden stairs attached to the left side of the residence. A wood framed garage is attached to the left side of the residence. (A photograph of the 341 Union Street location is attached to Attachment A-4).

32. Information from National Grid indicates that Rosa Bravo (whom agents believe is the wife of Jose Sanchez Pabon, the person from whom a confidential source made controlled purchase of cocaine from on various occasions in and about June 2004 and whose supplier was MENDOZA, a customer of the Morfin DTO) is the subscriber for this location with a listed contact number of 978-345-5852.[5]  Based upon intercepted calls to the Target Telephones and physical surveillance, TEODORO and JOSE CARDENAS have traveled from the 341 Union Street location on numerous occasions to meet with drug customers, deliver narcotics and retrieve narcotics proceeds, and on numerous occasions, has returned to this location after meeting with drug customers for the above mentioned activities.

---

[5]Bravo is the only subscriber that National Grid has on file for the 341 Union Street location. Based upon surveillance, Bravo and Pabon are believed to live on the first floor of this location. Based upon interceptions and surveillance, the stash location used by the TEODORO and JOSE CARDENAS and the Morfin DTO is on the second floor of this location. The stairs to the second floor apartment are located on the outside of this residence and surveillance agents have observed TEODORO and JOSE CARDENAS and other members of the Morfin DTO enter the second floor and the garage.

5.    **30 North Main Parkway, Apartment 1 West, Leominster, Massachusetts**

**Description of Premises (Attachment A-5)**

33.    30 North Main Parkway, Apartment 1 West, Leominster, Massachusetts is a white-colored, three- story, multi-family dwelling with black shutters. The lower half of the building is red brick. The numbers "30" are black and affixed to the awning above the front door of the building. The front door of the building is a steel framed glass door which leads to a second steel framed glass door inside a common entryway. It is accessed from a set of brick and concrete steps leading up from a common driveway to the front of the building. There is a three bay attached garage located to the left front of the building. Entering from the front entrance, Apartment 1 West is located to the right of the entrance.

34. HUNTER resides at this location. According to National Grid information, the subscriber for electrical service for Apartment 1 West is Carlos Carrasquillo. The names "Carrasquillo" and "Hunter" appear on the mailbox for Apartment 1. On numerous occasions, HUNTER has been observed entering and exiting 30 North Main Parkway. On March 11, 2005, surveillance agents observed Leonel Cervantes-Garcia (a person previously identified as a customer of the Morfin DTO) arrive at 30 North Main Parkway and go to Apartment 1 West. A black male (believed to be HUNTER's brother) answered the door for him. Based upon intercepted calls to Target Telephones 1, 3 and 4 (GILBERTO's telephones), and physical surveillance, HUNTER has traveled from his residence on numerous occasions to meet with drug customers and members of the Morfin DTO including GILBERTO, TEODORO and JOSE CARDENAS and, on numerous occasions, has returned to this location after meeting with these individuals. There is probable cause to believe that HUNTER's residence is a location that HUNTER uses to stash cocaine and marijuana and money to pay the Morfin DTO for same.

## II. PROBABLE CAUSE FOR CRIMINAL COMPLAINT FOR TARGET SUBJECTS
### A. Interception of Wire Communications over Target Telephone 1 Begins

35.    On October 28, 2004, the Honorable Nathaniel M. Gorton in the United States

16

District Court for the District of Massachusetts authorized the interception of wire communications occurring over Target Telephone 1.

36.    On October 29, 2004, interception of Target Telephone 1, GILBERTO's cellular telephone began.[6] Even as GILBERTO was returning to Massachusetts from California that day, he was conducting drug business over Target Telephone 1. Cell site information indicated that GILBERTO was in the area of the Los Angeles International Airport. In calls intercepted later that day, GILBERTO indicated to JUANITO that he was about to get on a flight (to Massachusetts) and would be arriving on America West flight at 7 p.m. Agents checked with America West and confirmed that Flight 400 was arriving at Logan Airport in Boston at 7 p.m. Agents also had the airline check the manifest for this flight and GILBERTO and MIGUEL ARTEAGA were listed as passengers and seated next to each other on this flight. Later that evening, surveillance agents reported to baggage claim area for the flight at Logan Airport. At approximately 7:37 p.m., a surveillance agent observed GILBERTO receive a telephone call on his cellular telephone. An incoming call to GILBERTO was monitored at the same time from an unidentified male, later identified as JESUS MENDOZA, in which MENDOZA indicated he needed a "corner" (believed to be a quarter of a kilogram of cocaine).[7]

──────────────────

[6]Intercepted conversations on the Target Telephones were in Spanish. The summaries of intercepted conversations on the Target Telephones set forth in this affidavit are based upon summaries of conversations and draft translations that have been prepared by monitors who are fluent in Spanish and English. The intercepted conversations included telephone-to-telephone as well as push-to-talk communications; I refer to both of these type of communications as calls. The calls summarized below are not all of the calls that have been intercepted, nor are the summaries verbatim accounts of each call. The summaries are based upon preliminary summaries of the calls prepared by monitoring agents and information from agents involved in this investigation. Where necessary, an interpretation of the substance of the calls based upon my training and experience and the information developed to date in this investigation is provided in parenthetical explanations or at the end of a summary of a series of calls.

[7]A few days later, on November 1, 2004, GILBERTO, through TEODORO, made a delivery of drugs to MENDOZA. During the calls preceding this transaction, MENDOZA asked GILBERTO to tell him (his compadre or TEODORO) to hurry because he (MENDOZA's customer) was getting anxious. GILBERTO told MENDOZA to tell him to wait because he (TEODORO) would arrive soon. Several minutes later, GILBERTO and MENDOZA discussed the delivery by TEODORO. MENDOZA told GILBERTO that he (TEODORO) had arrived but that it didn't look like the same stuff as the other day and that the stuff looked different.

37.    The following day, on October 30th, GILBERTO had several conversation with HUNTER regarding payment for and purchase of narcotics. At approximately 3:43 p.m., GILBERTO placed a call to "EL NEGRO" (HUNTER)[8] and HUNTER told him that he may want a whole one and asked about "21." In a later conversation, HUNTER told GILBERTO that he would have the "chavos" (slang for money) now, today, tonight. GILBERTO asked if he (HUNTER) was sure. HUNTER affirmed and asked if "it" was pure, ready and perfect. GILBERTO responded that it is good. HUNTER asked if it was the same as the last time and GILBERTO affirmed that it was. HUNTER then asked several times if it hadn't been touched. GILBERTO responded by asking HUNTER about payment for the product and HUNTER responded that he would give GILBERTO all the money that night around 6:00 p.m. GILBERTO then related a story to HUNTER about an unknown subject who took "four" and took off. HUNTER responded to GILBERTO that they had been doing this for years and that he (HUNTER) would never do that to anybody. He also assured him that if anything happened that he would cover it. HUNTER related further he (HUNTER) had been doing business with them (Morfin DTO) for too many years and they (Morfin DTO) had treated him (HUNTER) too good for him to rip them off.

38.    At approximately 4:32 p.m., GILBERTO placed a call to TEODORO. After

---

GILBERTO told MENDOZA that his vision is betraying him. MENDOZA told GILBERTO that he returned the stuff from the other day to GILBERTO because it was no good. MENDOZA told GILBERTO that he will call him back later to let him know if he needed to take back the "Tortillas" (product). I believe that during these conversations, MENDOZA had a customer that was at MENDOZA'S house waiting for the delivery and that when MENDOZA told GILBERTO that the stuff looked different, that he was complaining that it is not the same quality of narcotics that MENDOZA has received from GILBERTO in the past. The next day, November 2, 2004, there were two calls intercepted over Target Telephone 1 between GILBERTO and MENDOZA. During these conversations, GILBERTO and MENDOZA discussed how much money MENDOZA owed GILBERTO. GILBERTO told him $8,250. MENDOZA told GILBERTO that GILBERTO was crazy, that GILBERTO told him that he was going to lower it for him this time. GILBERTO told MENDOZA that he would come down 50 to $8,200. I believe that during these conversations GILBERTO and MENDOZA discuss the money that is owed by MENDOZA for the narcotics that GILBERTO had delivered to MENDOZA the previous day.

[8]Throughout the intercepted calls, HUNTER and other of the Target Subjects were referred to by nicknames or other aliases. For ease of reference, I shall refer to the identified participants in an intercepted call by their formal names.

18

confirming TEODORO'S location, he (GILBERTO) instructed him to turn back and pick out a "thin/lean" one for HUNTER. GILBERTO stressed that TEODORO was to reach in and grab 10 if he had to until he got a really "thin/lean" one for HUNTER. At approximately 5:09 p.m., GILBERTO placed an outgoing call to HUNTER and asked for his location. HUNTER responded that he was next to the "Shaw's" and could be there in two minutes. GILBERTO told HUNTER he would meet him there. At approximately 5:15 p.m., agents observed Massachusetts registration 7127XO, a 1998 white Ford Pickup registered to GILBERTO, parked in the parking lot of the Shaw's Supermarket, Route 12, Leominster, Massachusetts. Agents observed a tall black male, later identified as HUNTER, standing along the driver side door of GILBERTO'S vehicle talking to the operator. Agents then observed HUNTER enter a 2004 grey Volvo, New York registration CTV3049, registered to Hertz LLC (a vehicle later confirmed to be rented to HUNTER during the time of the aforementioned observations). Agents then observed as the two vehicles left the area. At approximately 7:36 p.m., GILBERTO received a call from HUNTER. He advised GILBERTO everything looked good and asked when GILBERTO wanted to see him. GILBERTO told HUNTER, right now. After making arrangements to meet, HUNTER told GILBERTO he (GILBERTO) still owed him (HUNTER) 14 grams and asked for it tonight. GILBERTO affirmed.

39. I believe that during these conversations, GILBERTO and HUNTER were discussing the sale/purchase of one kilogram of cocaine. I believe that when HUNTER asked GILBERTO about "21" and GILBERTO affirmed, they were referring $21,000.00 dollars, a price consistent with one kilogram of cocaine. I also believe that when HUNTER asked if "it" was pure, ready and perfect and questioned if it had been touched, he (HUNTER) was questioning the quality of the cocaine. I also believe that when HUNTER advised GILBERTO that he (GILBERTO) still owed him (HUNTER) 14 grams, he was referring to cocaine. The previously intercepted calls also indicated that HUNTER had been a drug customer of the Morfin DTO for some time and was

19

assuring GILBERTO that he would pay his drug debt and would not cheat the organization out of their money for drugs.[9]

### B. MORFIN DTO Makes Arrangement for November 2004 Delivery of Marijuana Load

40.     Between October 30th and November 6th, there were a series of intercepted calls over Target Telephone 1 involving, GILBERTO and, at various times, JUANITO and "Gordo" (later identified as VICTORIA) about arrangements for the transport of a load of marijuana from Arizona to Massachusetts for the Morfin DTO. Based upon these interceptions, VICTORIA and his brother-in-law would drive a tractor-trailer unit, containing marijuana from Arizona, via California, to Massachusetts. Also based upon the intercepted calls, JUANITO (with the assistance of Padrino)

---

[9]During the course of this investigation, it appears that some customers of the Morfin DTO were purchasing cocaine and marijuana, like HUNTER. Others, like ROJAS, were just purchasing cocaine. On January 25, 2005 at approximately 7:35 p.m., ROJAS said he wanted to see if GILBERTO had "work" to "work the snow." GILBERTO said that there was "work." ROJAS asked how much it was going for. GILBERTO responded it's at "2,1." ROJAS then stated that he only wanted to work a half a day. Later in this conversation, ROJAS said he would take half and would give the other half to his friend. At approximately 4:44 p.m. the next day, GILBERTO received a call from ROJAS. GILBERTO told ROJAS that his "compadre" (TEODORO) was heading down there now. ROJAS said that he did not live there anymore and provided GILBERTO with directions to his Beacon Street, Apartment 1, Fitchburg, Massachusetts residence. GILBERTO subsequently called TEODORO and provided TEODORO with the directions. At approximately 5:01 p.m., agents observed Massachusetts registration 99WG49, 1993 green GMC Sierra pickup, arrive and park in front of the ROJAS residence. Agents observed TEODORO and JOSE CARDENAS exit the vehicle and enter the residence at 28 Beacon Street. Agents also observed a blue Dodge Ram pickup registered to ROJAS parked in front of the residence. At approximately 5:04 p.m., GILBERTO placed an outgoing call to TEODORO and asked if he (TEODORO) found ROJAS and TEODORO said he was with ROJAS. At approximately 5:22 p.m., GILBERTO placed another call to TEODORO and asked if ROJAS gave him (TEODORO) half. TEODORO affirmed. A few minutes later, agents observed as TEODORO and JOSE CARDENAS left the area of the ROJAS residence. On February 8, 2005 at approximately 6:49 p.m., ROJAS told GILBERTO that he still had GILBERTO's "thing" (meaning the remainder of money owed for drugs) there and asked for another day. ROJAS stated further that it would be ready tomorrow or the day after. They then made arrangements to meet the next day. Based upon intercepted conversations, surveillance and agents experience, I believe there is probable cause to believe that during these calls GILBERTO and ROJAS were discussing the purchase of 1 kilogram of cocaine by ROJAS from GILBERTO for $21,000 dollars. I believe further there is probable cause to believe that on January 26, 2005, TEODORO and JOSE CARDENAS, at the direction of GILBERTO, distributed 1 kilogram of cocaine to ROJAS at his residence. I also believe TEODORO and JOSE CARDENAS collected approximately $10,500.00 dollars from ROJAS at that time.

was coordinating the assembly of and arrangements for the transport of this marijuana for the Morfin DTO. As revealed in the intercepted calls, there was a delay in the transport of this load and there were numerous discussions about the ramifications of same. For example, on October 30, 2004, GILBERTO, on Target Telephone 1, called RIGOBERTO at a phone number that later began to be intercepted (as Target Telephone 2), RIGOBERTO's phone, and spoke with RIGOBERTO and then JUANITO. In the subsequent conversation between GILBERTO and JUANITO, GILBERTO expressed concern about the status of the transporter for load of marijuana, VICTORIA, and the status of the marijuana. That same day (October 30th), GILBERTO and JUANITO had several conversations in which they discussed the delay in the transport of marijuana, the cause of the delay and the effect of the delay on VICTORIA. In the course of these communications, GILBERTO said that VICTORIA had been there three days already. JUANITO told GILBERTO to tell VICTORIA not to worry, that everything was under control and they needed VICTORIA. JUANITO said that the "family has to be together to dress them" (meaning that the marijuana had to be together to be put in the compartment). GILBERTO said that they had to send VICTORIA money and JUANITO agreed.

41.    On November 1, 2004, GILBERTO received a call from JUANITO. During the call JUANITO told GILBERTO to advise VICTORIA to go ahead and get his flight back here, so he would be in place. JUANITO further advised GILBERTO that he needed VICTORIA now. On November 3, GILBERTO received a call from JUANITO. GILBERTO asked if VICTORIA had left yet. JUANITO responded that he (VICTORIA) had gotten on the flight, but he had forgotten to ask what time he was supposed to get in. In a subsequent call, JUANITO advised GILBERTO that he (VICTORIA) was bringing his brother-in-law who was also a truck driver. On November 4, GILBERTO received a call from VICTORIA who asked if they were ready and that he (VICTORIA) would be visiting GILBERTO on Monday. During this call, VICTORIA indicated that he was arriving in Los Angeles. On the morning of November 5, GILBERTO received a call from JUANITO. He advised GILBERTO to call VICTORIA because he (JUANITO) had the load ready

21

and VICTORIA needed to start heading for Fresno. GILBERTO then advised VICTORIA who responded in subsequent calls that he would be on his way. During the evening of November 5, JUANITO called GILBERTO and advised he had already sent VICTORIA on the way with the cargo. On the morning of November 6, VICTORIA called and advised GILBERTO he was in Sacramento. During several subsequent calls, VICTORIA and GILBERTO make arrangements to wire money to pay for VICTORIA'S travel expenses.

42.    Based upon investigative information (including an intercepted call between VICTORIA and GILBERTO in which VICTORIA indicated that he was traveling through mountains [which agents believed to be the Sierra Nevadas]), VICTORIA was traveling east bound along Interstate 80 in the area of the California, Nevada border on November 6, 2004, at approximately 3:00 p.m. (EST). At approximately 4:00 p.m., agents believed VICTORIA to be stationary in an area west of Mustang, Nevada, where he remained for several hours. At approximately 7:00 p.m., agents observed VICTORIA depart the area and continue driving on Interstate 80 east bound. At approximately 7:18 p.m., Troopers from the Nevada Highway Patrol conducted a routine motor vehicle stop of the tractor trailer unit for failing to stay in a single lane. The operator of the vehicle was identified as VICTORIA. The passenger was identified as VICTORIA'S brother-in-law, Jovanni Mendoza. The registered owner of the vehicle was identified as Juan M Vargas (a/k/a JUANITO), d/b/a J and B Trucking. During the stop, VICTORIA and Jovanni Mendoza consented to a search of the vehicle. During the search, Troopers observed what they believed to be a false wall inside the front of the trailer unit. Once offloaded, Troopers located approximately 355 pounds of marijuana inside the hidden compartment. VICTORIA and Jovanni Mendoza were subsequently arrested, but are currently out on bail.

43.    Subsequently intercepted calls over Target Telephone 1 indicate that the Morfin DTO was quickly informed of the law enforcement seizure of this load of marijuana. On November 7, 2004 at approximately 9:40 a.m., GILBERTO received a call from JUANITO. During the course of this conversation, JUANITO said, "We have to get through this and move on, God

22

willing." Also during the conversation JUANITO explained that he was worried he was "going to be investigated for this." GILBERTO advised JUANITO, to get a lawyer and tell the lawyer that he (JUANITO) had loaned the truck to VICTORIA and that he (JUANITO) didn't know anything about what VICTORIA was going to do with it. Later in the conversation, JUANITO said he was happy because this trip was going to pay for itself, and "look how it turned out." I believe that JUANITO was worried that he would be implicated in the transport because he owned the truck. During subsequent calls throughout the day (November 7th), GILBERTO spoke with JUANITO and several members of VICTORIA'S family about arranging for bail and retaining legal representation for VICTORIA. At approximately 8:58 p.m., GILBERTO placed a call to RIGOBERTO. RIGOBERTO advised GILBERTO to just shut off the phone immediately (meaning that he should get rid of Target Telephone 1, the telephone he had used to arrange the marijuana transport). RIGOBERTO related further that they will just have to be careful. GILBERTO told RIGOBERTO he was trying to find a lawyer for him (VICTORIA) down in Nevada. RIGOBERTO then stated they have gotten out of worse things than this (matter).[10]

44.    In a call the following day, November 8, 2004, GILBERTO asked RIGOBERTO where to get a phone. RIGOBERTO advised he would call to get a phone at the store and would buy two radios. GILBERTO later placed a call to RIGOBERTO and asked if he was ready. RIGOBERTO replied, almost. GILBERTO then advised RIGOBERTO that he should not change

---

[10]In other subsequent calls, GILBERTO made coded reference to the November 6th seizure. On November 7, 2004, at approximately 2:09 p.m., GILBERTO received a call from MIGUEL ARTEAGA. During the call, ARTEAGA asked GILBERTO about the ones for one and a half. GILBERTO asked ARTEAGA to clarify and he responded, the ones for "one peso" (referring to pounds of marijuana which sell for $1,000.00 dollars) GILBERTO indicated that he understood. Later the same day, GILBERTO received a call on Target Telephone 1 and spoke to ARTEAGA. During a series of push-to-talk calls, GILBERTO told ARTEAGA he was going to turn some "papers" (drug proceeds) in to ARTEAGA tomorrow. ARTEAGA asked GILBERTO if it was the ones he told him about in the morning or if there were more. GILBERTO then said, in the morning and that someone had an "accident." ARTEAGA responded by saying he was just thinking about it all. GILBERTO then told ARTEAGA he needed him to come back tomorrow and ARTEAGA agreed. I believe that when GILBERTO said someone had an accident, he was referring to the November 6, 2004 arrest of VICTORIA and subsequent seizure of marijuana.

his phone. At approximately 12:16 p.m, . GILBERTO received a push-to-talk call from MIGUEL ARTEAGA. GILBERTO told MIGUEL ARTEAGA that he (GILBERTO) needed to dump his phone (Target Telephone 1) immediately. MIGUEL ARTEAGA asked GILBERTO if he should drop his phone too and GILBERTO instructed him to do so. On November 8, 2004 at approximately 2:03 p.m., agents surveilled GILBERTO as he went to a Nextel reseller, Sam and Friends. GILBERTO was observed leaving Sam and Friends at approximately 2:15 p.m. No calls were intercepted on Target Telephone 1 after November 8, 2004. Conversely, use of Target Telephone 3 by GILBERTO began on November 8, 2004. Based on these and related interceptions and surveillance, I believe that when GILBERTO went to Sam and Friends on November 8, 2004 he acquired Target Telephone 3 and began to use it in lieu of Target Telephone 1.

## III. WIRE INTERCEPTION CONTINUES OVER RIGOBERTO'S TELEPHONE (TARGET TELEPHONE 2) and GILBERTO'S NEW TELEPHONE (TARGET TELEPHONE 3)

45.    On December 2, 2004, Judge Nathaniel M. Gorton issued an Order authorizing the interceptions of wire communications occurring over Target Telephone 2, a telephone used by RIGOBERTO, and Target Telephone 3, GILBERTO's new telephone. Interceptions over Target Telephone 2 began on December 2, 2004 and are ongoing. Interceptions over Target Telephone 3 began on December 2, 2004 and ended on February 9, 2005.

### A. GILBERTO Continues to Supply Drugs to HUNTER

46.    On December 13, 2004, at approximately 2:19 p.m., GILBERTO received a call on Target Telephone 3 from HUNTER. HUNTER asked GILBERTO if he was ready to go to work. GILBERTO said no. HUNTER asked, Friday or Saturday? GILBERTO said in a week or something. HUNTER asked about "shirts" and if GILBERTO had a "picture" or not. HUNTER told GILBERTO he wanted a bunch of shirts. GILBERTO told HUNTER he could have them in an hour or two and that he would call HUNTER back in an hour. At approximately 4:06 p.m., GILBERTO placed a call to HUNTER and made arrangements to meet at the K-Mart on Route 12, Leominster,

24

Massachusetts. During further conversations, GILBERTO advised HUNTER that he (GILBERTO) was operating a white mustang. At approximately 4:30 p.m., agents observed a 2001 white Ford Mustang with Massachusetts registration 29GR26, registered to GILBERTO, in the parking lot of the K-Mart, Route 12, Leominster, Massachusetts. At approximately the same time, agents observed Massachusetts registration, 48AR48, a 2005 blue Nissan Altima registered to Enterprise Rent-a-Car (later determined to be rented to HUNTER), also traveling through the parking lot of the K-Mart. Agents then observed an unknown subject, later identified as HUNTER, exit the Nissan and receive an unknown object from a subject in the Mustang. The Mustang then departed the area and HUNTER returned to his vehicle. Agents maintained surveillance on HUNTER as he traveled directly to the vicinity of his residence, 30 North Main Parkway, Leominster, Massachusetts. That night, GILBERTO received a call from HUNTER. GILBERTO asked HUNTER if he liked it or not. HUNTER said, "it's nice, but too expensive." GILBERTO then asked HUNTER how much he would take if he were to give it to him at twelve-fifty. HUNTER responded, like one-hundred and like cash. After further conversation and negotiation about the price, HUNTER advised GILBERTO that he could not do anything with "that." Based upon intercepted conversation, surveillance and experience, I believe that during these conversations, GILBERTO and HUNTER were discussing the sale of marijuana. I believe that when HUNTER says "what about shirts," he is referring to the availability of marijuana. I also believe that when he asked if GILBERTO had a "picture" he wanted to view a sample of the marijuana. I also believe that GILBERTO provided a sample of marijuana to HUNTER in the parking lot of the K-Mart and that when HUNTER said, "it's nice, but too expensive," he was referring to the price of the marijuana.

      47.    On January 3, 2005, at approximately 10:54 a.m., GILBERTO called HUNTER. HUNTER told GILBERTO that his buddy was coming down like at 2:00 or 3:00 o'clock for sure. GILBERTO told HUNTER he did not want to let it pass one more day. HUNTER then asked, "100 cash," what's the best price you can give me. HUNTER then repeated, how much would you charge for "100 shirts in cash." GILBERTO asked to speak to HUNTER in person. HUNTER

25

informed GILBERTO he was still in Florida and that his buddy, El Gringo (believed to be FELKER), the one who got the "shirts," would see GILBERTO today. During subsequent calls, HUNTER told GILBERTO that his buddy was coming down right now with 65,000 (dollars) and hopefully it would be a little bit more by the time he got down here. During further conversation, HUNTER asked GILBERTO about a price for "100 C.O.D." HUNTER told GILBERTO if he gave him (HUNTER) "100," he would give him (GILBERTO) the cash right there for it. At approximately 2:39 p.m., HUNTER said "he" (FELKER) would be there at 3:30 p.m. with "seventy- five dollars."

48.    At approximately 3:06 p.m., GILBERTO placed another call to HUNTER. GILBERTO told HUNTER he would be at the Longhorn Restaurant. HUNTER told GILBERTO that he (a third party later identified as FELKER) would be in a blue car which was the same car that GILBERTO'S buddy knows. GILBERTO told HUNTER he saw it and it was the same car, but questioned HUNTER as to who the person was. HUNTER responded with, "it's the same guy that you gave the "camisas (shirts) to at the house." GILBERTO then called JOSE CARDENAS to instruct him to meet with FELKER. At approximately 3:23 p.m., agents observed Massachusetts registration 33JW59, a white 2000 Ford Taurus registered to JOSE CARDENAS, enter the parking lot of the Longhorn Restaurant, Route 12, Leominster, Massachusetts. Minutes later, agents observed Maine registration 2154MP, a grey Lincoln Continental registered to FELKER, enter the same parking lot, pull to the rear of the restaurant and park. Agents observed FELKER and an unknown female subject exit their vehicle and open the trunk. Agents then observed the Ford Taurus park and the operator (later identified as JOSE CARDENAS) exit the vehicle and approach FELKER. After a brief encounter, agents observed JOSE CARDENAS depart the area. A short time later, agents observed FELKER depart the area and travel onto Route 495 northbound toward Maine (where he lives). At approximately 3:39 p.m., GILBERTO received a call from HUNTER who asked if everything was O.K. GILBERTO responded he was going to count now. HUNTER said it's "seventy-five." Based on the intercepted conversations, surveillance and experience, I believe that during this series of calls that GILBERTO and HUNTER were discussing the purchase

26

of and payment for a large amount of marijuana by a customer of HUNTER'S. I believe further that HUNTER had approximately $75,000 delivered to JOSE CARDENAS at the Longhorn Restaurant by FELKER. I believe that when HUNTER says "100 cash" he was referring to 100 thousand dollars. I believe that when HUNTER says "100 shirts in cash" he was referring to 100 pounds of marijuana to be paid for in cash. I also believe that HUNTER was asking about arranging another marijuana transaction as well.

### B. MORFIN DTO Makes Arrangements for Transport of $209,000 That is Seized on December 30, 2004

49.     Between December 18, 2004 and January 1, 2005, there were a series of intercepted calls over Target Telephones 2 and 3, involving GILBERTO, RIGOBERTO, JUANITO and an individual referred to as "Padrino" (Spanish for godfather), about arrangements for the transport of a load of U.S. currency from Massachusetts to Arizona. Based upon these intercepts, there is probable cause to believe that this shipment of currency was a payment for a shipment of marijuana which was seized in Nevada on November 6, 2004 as previously described. Specifically, OCTAVIANO, JUANITO's brother and two other individuals (Yesenia Rodriguez-Sahagun and Luz Valencia) would drive a vehicle with a spare tire filled with U.S. currency form Massachusetts to Arizona from the Morfin DTO to pay for marijuana.

50.     There were numerous intercepted calls about arranging this transport. For example, on December 18, 2004, RIGOBERTO and OCTAVIANO spoke with JUANITO. JUANITO told OCTAVIANO that he spoke with Padrino and that Padrino said that OCTAVIANO should go by the map and take the road that is shaded in red and avoid taking the big road so that the license plates don't look bad.

51.    On December 19, 2004, RIGOBERTO and GILBERTO discussed how much money was going to be sent with OCTAVIANO.    RIGOBERTO told GILBERTO that OCTAVIANO wanted only to take half even if the whole thing was there. GILBERTO went on to say that he should take the whole thing (meaning that OCTAVIANO should take all the money with him). In further conversations that day, RIGOBERTO talked to JUANITO and told him not to get

27

nervous because JUANITO's godfather (meaning Padrino) had already instructed OCTAVIANO about which route to take and that OCTAVIANO would take his (RIGOBERTO's) SUV and that they were giving him all of the information that was needed (meaning that OCTAVIANO would have all the money). That same day there were several intercepted conversations between GILBERTO, RIGOBERTO and JOSE CARDENAS on Target Telephone 3 in which they discussed a spare tire. In one such call, GILBERTO asked JOSE CARDENAS if he knew how to remove a tire. JOSE CARDENAS said yes and then they discussed the tools needed to do so. GILBERTO said that he was going to purchase those tools so that Jose could do it. In a later call on Target Telephone 3, RIGOBERTO told GILBERTO that they couldn't pump in the air, and then he went on to say that it might be due to a bad valve that came off or it might be covered up and it is not taking any air. GILBERTO told RIGOBERTO to bring it back and they would fix it. RIGOBERTO complained that they had trusted that guy (JOSE CARDENAS) and he didn't know how to do the job. RIGOBERTO then went on to say that maybe the valve was covered and the air can't go through so they must make sure that nothing touches it, otherwise the air would just come out. Based upon these interceptions, there is probable cause to believe that they were discussing having packed money inside a tire and they were now having a difficult time filling it with air.

52.    On December 20, 2004, additional calls over Target Telephone 3 related to the spare tire took place. During these conversations, GILBERTO suggested to RIGOBERTO that they should get the tire out at once and that he would call the crybaby (JOSE CARDENAS) to go load up the tire in the trunk and leave the truck there without it. GILBERTO then called JOSE CARDENAS and told him to go to Rigo's (meaning RIGOBERTO's) and get the tire. Subsequent to this call, RIGOBERTO called JOSE CARDENAS and instructed him to go to the garage, pull out the tire, load it into his car and leave right away. JOSE CARDENAS asked if he should pull into the garage and RIGOBERTO confirmed that he should do so. RIGOBERTO then told JOSE CARDENAS to go into the garage and take the tire over there (meaning TEODORO's residence at the 341 Union Street location) and close the garage door so that no one would see him when he

loaded up the tire into the car. In the last of these calls, GILBERTO spoke with TEODORO and told TEODORO that it would be a good idea for TEODORO to bring the tire over to GILBERTO's location. TEODORO agreed to drop off the tire at GILBERTO's.

53.    Later that day, in a series of calls, RIGOBERTO, GILBERTO and JUANITO discussed whether OCTAVIANO should return to Arizona with or without the money (and then decided to delay OCTAVIANO's transport of the money). RIGOBERTO told GILBERTO that he thought it would be a better idea if OCTAVIANO left empty handed and GILBERTO agreed. RIGOBERTO continued on to say that it will be worse to lose it on the way, that they (law enforcement) might let him get away from here to then get him down the road (meaning that law enforcement might stop him on the highway and take the money from him). RIGOBERTO then told GILBERTO that it would be best if OCTAVIANO came back with another car that won't be registered under his name and he could come back with a similar car that they could fit that one (tire) (meaning that he should get a car where the tire would look similar to the one on his vehicle). In one of these calls, RIGOBERTO told JUANITO that he had bad news for JUANITO, that the guy (OCTAVIANO) was going to leave now and he would not be able to take anything with him as it looked that there were "flies on the cord" (meaning that they spotted surveillance) and instead of compromising it, it was best that he leaves and comes back in another car. RIGOBERTO suggested to JUANITO that once OCTAVIANO got back to JUANITO's location that OCTAVIANO head back to RIGOBERTO's location in a plane and drive back to JUANITO's location in a car that RIGOBERTO was going to get for him. JUANITO, RIGOBERTO and GILBERTO all discussed the possibility that GILBERTO was going to find a female who would be willing to put a vehicle under her name (meaning that they were going to try to get a car registered to a female and then have her use it to transport the money to Arizona).

54.    On December 21, 2004, RIGOBERTO and JUANITO again discussed the delay in transporting the currency to Arizona. JUANITO told RIGOBERTO that Padrino gave him an option. JUANITO explained that someone from Rigo's (meaning RIGOBERTO's) location could

29

bring it down to where Padrino used to live, which was not far from Massachusetts. JUANITO said that from there on, Padrino would provide the transportation in order for them to go down and Padrino would tell them where to go.

55.    On the morning of December 30, 2004, surveillance agents observed a 2000 Chevrolet Tahoe, MA registration 48DH60, registered to Yesenia Rodriguez, 2 Harrison Street, Apartment 1, Leominster, Massachusetts 01453 leave the Leominster area. On its way out of town, the vehicle and its occupants stopped at the 2 Harrison Street residence and were observed meeting with GILBERTO there. After this meeting, the vehicle continued out of town. Later that day, surveillance agents observed as it approached Exit 18 on Interstate 95 in New York. At that time, a New York State trooper stopped the vehicle for speeding. At the time of the stop, Yesenia Rodriguez-Sahagun consented to a search of the vehicle. Officers found 9 bundles of money, totaling approximately $209,000 in U.S. currency wrapped in plastic in a spare tire secured underneath the vehicle. The officers gave Rodriguez-Sahagun a receipt for the money seized and the occupants of the vehicle were allowed to leave.

56.    On December 30, 2004, there were several intercepted conversations over both Target Telephone 2 and 3 regarding the vehicle stop and subsequent seizure. GILBERTO told RIGOBERTO that the cops gave them a ticket and then let them go. RIGOBERTO asked GILBERTO if they took that (money) and let them go and GILBERTO confirmed this. RIGOBERTO and JUANITO also discussed the money seizure. RIGOBERTO told JUANITO to tell Padrino right away what happened to see what he says. JUANITO agreed to do so. RIGOBERTO expressed that he was ashamed of all that has happened with "El Padrino" and him. RIGOBERTO also told JUANITO that Padrino should put his people behind the wheel and that it would be better that way. Later, JUANITO told RIGOBERTO that he spoke with Padrino and that Padrino wanted to know if anything was left over there and RIGOBERTO said a very small amount. JUANITO went on to say that they (RIGOBERTO and GILBERTO) have to hand over the trucks (meaning that they would have to give vehicles to Padrino as a form of payment until they could send

30

more currency). On the same day, GILBERTO spoke with OCTAVIANO and the other two occupants of the vehicle and they discussed the vehicle stop. OCTAVIANO explained that they (law enforcement) asked a lot of questions and that they gave him a document in case they wanted to claim it (meaning that law enforcement gave them a receipt for the money seized). They all agreed that they would meet the next day to discuss the situation.

57. On December 31, 2004, JUANITO and RIGOBERTO spoke regarding Padrino. JUANITO said that he (Padrino) says that he has to go to MA and see with his own eyes and states that he (Padrino) will be more satisfied that way. JUANITO stated that he (Padrino) was upset and that they were arguing about it a bit.

58.    On January 1, 2005, JUANITO, RIGOBERTO and Padrino discussed the seizure of money, and ways to try to work it out. Padrino told RIGOBERTO that things were not in our (Padrino's) hands (meaning that he was being pressured for the money). RIGOBERTO said that he was willing to turn over some vehicles to Padrino and Padrino said that these people would want the title in their names. RIGOBERTO stated that the titles were all there and that they are very large vehicles. The two agreed to continue to attempt to work things out.

### C. January 7, 2005 Seizure of over $69,000 from FELKER

59. On January 6, 2005, at approximately 2:50 p.m., HUNTER advised GILBERTO that his buddy would be down the next day with everything. On January 7, 2005, at approximately 2:24 p.m., HUNTER asked GILBERTO if there was any "blanco" (white). GILBERTO responded negatively. HUNTER then said his buddy should be on time and he (HUNTER) would call him (GILBERTO) when he (the third party) was around. Based upon previously intercepted conversations and surveillance, I believe that when HUNTER said his buddy would be down tomorrow with everything, he was referring to FELKER delivering a large amount of U.S. currency to the Morfin DTO and that the money was a payment for marijuana. I also believe that when HUNTER asked GILBERTO if there was any "blanco," he was referring to the availability of cocaine which he and GILBERTO had discussed in previous conversations.

31

60. At approximately 2:30 p.m. that day , the Massachusetts State Police observed a vehicle with Maine registration 2154MP, registered to FELKER, traveling southbound on Route 495 in the town of Andover. They conducted a routine stop of the vehicle for tailgating and marked lanes violations. Based upon a consensual search of the vehicle, $69,880 was located in the trunk and seized. FELKER was identified and released. At approximately 3:09 p.m., HUNTER reported to GILBERTO that "there's been a problem. The dude was almost there and he got pulled over and the cops took seventy big ones, the chavos." HUNTER went on to say that he (FELKER) would be back down on Monday with "everything." During further conversation, GILBERTO told HUNTER he did not want HUNTER to tell him three or four days. HUNTER again explained what had happened and assured GILBERTO he would have it all again on Monday. GILBERTO said he would be waiting on Monday. Based upon intercepted conversations and the seizure, I believe that the $69,880 was intended to be delivered to GILBERTO as partial payment for a load of marijuana supplied to HUNTER and FELKER by the Morfin DTO.

### D. Seizure of 100 Pounds of Marijuana from FELKER's Brother on January 15, 2005

61.    On January 14, 2005, at approximately 11:15 p.m., GILBERTO (Target Telephone 3) received an incoming call from HUNTER. HUNTER told GILBERTO that he (HUNTER) would take 100 and would give GILBERTO a "G" for every one. GILBERTO and HUNTER agreed to meet around 2 p.m. the following day. On January 15, 2005, at approximately 2:33 p.m., GILBERTO placed a call to HUNTER who asked if GILBERTO would be ready at 3:30. GILBERTO said yes. HUNTER said, "it's going to be 100." At approximately 3:30 p.m., surveillance observed HUNTER meeting with FELKER in the parking lot of the Long Horn Restaurant, Route 12, Leominster, Massachusetts.

62.    At approximately 3:50 p.m., GILBERTO placed an outgoing call to HUNTER and asked if he was ready. HUNTER replied affirmatively and told GILBERTO that he was at the Long Horn Restaurant. Subsequently, surveillance agents observed as HUNTER left the area and FELKER remained in the parking lot. At approximately 4:02 p.m., surveillance agents observed

32

JOSE CARDENAS as he entered the parking lot and met with FELKER. At approximately 4:05 p.m., GILBERTO received an incoming call from JOSE CARDENAS who advised GILBERTO that HUNTER was not there. GILBERTO asked JOSE CARDENAS who was there. JOSE CARDENAS responded, the guy who usually picks up the "girls" (meaning FELKER). GILBERTO instructed CARDENAS to make delivery to FELKER (in HUNTER's absence). Surveillance then observed as both JOSE CARDENAS and FELKER exited their vehicles and transferred a large object from the trunk of JOSE CARDENAS' vehicle to the trunk of the FELKER vehicle. Subsequent to this meeting, agents observed the FELKER vehicle drive behind the Longhorn Restaurant (where it was briefly out of sight). Agents then observed the FELKER vehicle (later determined to be driven by FELKER's brother, Ralph Felker) and a second vehicle (later determined to be driven by FELKER) depart the area and then travel on Route 95 northbound into New Hampshire. In New Hampshire, the New Hampshire State Police stopped the FELKER vehicle (still being driven by Ralph Felker) for an expired motor vehicle registration. A subsequent search of the vehicle revealed approximately 100 pounds of marijuana located in the trunk.[11] Shortly after this car stop, the New Hampshire State Police conducted a stop of the motor vehicle being driven by FELKER. A subsequent search of this vehicle revealed that FELKER was in possession of a small amount of cocaine and approximately $3300 in U.S. currency.

---

[11]Although HUNTER was a regular, large-scale customer of the Morfin DTO, it is clear that the organization was supplying multiple customers with large quantities of drugs at the same time. For example, in or about the same time frame, interceptions revealed that GILBERTO was also negotiating to supply MENDOZA with a large quantity of drugs. On January 11, 2005, there was a call intercepted over Target Telephone 3 between GILBERTO and MENDOZA. During this conversation GILBERTO and MENDOZA discussed marijuana that MENDOZA wanted GILBERTO to deliver to him. During the call, MENDOZA told GILBERTO that he needed one of the big ones. GILBERTO replied that the one MENDOZA returned was the best one and he will give it to him for 10 ½ . MENDOZA then told GILBERTO to bring it. GILBERTO replied that he would be there in 10 to 15 minutes. I believe that during this conversation when MENDOZA says that he wanted a big one and that when GILBERTO replied that he would give it to him at 10 ½, that they were discussing MENDOZA purchasing a pound of marijuana for $1,050.

33

E.    **Seizure of Approximately 48 Pounds of Marijuana from FELKER**

63.    On January 29, 2005, at approximately 9:11 a.m., GILBERTO placed a call on Target Telephone 3 to HUNTER. HUNTER told GILBERTO that his buddy would not be in town until seven o'clock that night and asked GILBERTO to have everything ready for when he called so they could meet. At approximately 4:56 p.m., GILBERTO called TEODORO. He told TEODORO that HUNTER wanted him (TEODORO) to be ready at 5:30 and that GILBERTO would call him back later with a location for the meet. At approximately 5:30 p.m., GILBERTO spoke again to TEODORO and advised TEODORO to meet with HUNTER in twenty minutes and described the location as the Longhorn Restaurant, Route 12, Leominster, Massachusetts. At approximately 6:00 p.m., agents observed a vehicle registered to FELKER, arrive and park in the area of the restaurant. A short time later, agents observed TEODORO's vehicle arrive and park next to the FELKER vehicle. Agents then observed the passenger of the TEODORO vehicle and the driver of the FELKER vehicle exit and remove several large packages from the rear of the TEODORO vehicle, then place them in the trunk of the FELKER vehicle. Both Target Subjects then returned to their respective vehicles and departed the area separately. Agents maintained surveillance on the FELKER vehicle as it traveled to the area of the Leominster Hospital and met with a subject in a white Chevy Cavalier bearing a Maine registration. Agents then observed both vehicles depart the area and travel onto Route 2 eastbound. Agents maintained surveillance of both vehicles as they traveled in tandem onto 495 and subsequently onto route 95 northbound towards Maine. During the trip, agents observed both vehicles stop briefly at a Dunkin Donuts off of Route 95 in New Hampshire. At that time, agents identified the operator of the Chevy Cavalier as FELKER and the operator of the FELKER vehicle as an unknown male. At approximately 8:06 p.m., the New Hampshire State Police conducted a stop of the FELKER vehicle for a routine violation. The operator was identified as Michael Warner. A check of the registry of motor vehicle records revealed Warner's license to be suspended. He was arrested and an inventory of the vehicle was

34

conducted. During the inventory, approximately 48 pounds of marijuana was recovered from the trunk. Agents observed FELKER, who was not stopped, continue on Route 95 into Maine.

64.    On February 7, 2005, at approximately 11:45 a.m., agents surveilled GILBERTO as he went to a Nextel reseller, Sam and Friends. GILBERTO was observed leaving Sam and Friends at approximately 12:02 p.m. No pertinent calls were intercepted on Target Telephone 3 after February 8, 2005. Conversely, use of Target Telephone 4 began on February 7, 2005. Based on intercepted calls around this time, I believe that when GILBERTO went to Sam and Friends on February 7, 2005 he acquired Target Telephone 4 and began to use it in lieu of Target Telephone 3. It should also be noted that when GILBERTO switched from Target Telephone 1 to Target Telephone 3 he also went to Sam and Friends and then immediately discontinued using Target Telephone 1 in lieu of Target Telephone 3.

## IV.    INTERCEPTION OF GILBERTO's NEXT NEW TELEPHONE (TARGET TELEPHONE 4) BEGINS

65.    Judge Nathaniel M. Gorton authorized interceptions of wire communications occurring over Target Telephone 4, GILBERTO's telephone, on February 18, 2005 (at the same time that he authorized the continued interception of Target Telephone 2, RIGOBERTO's telephone). Interception over Target Telephone 4 began on February 18, 2005. Interceptions over Target Telephone 2 and Target Telephone 4 remain ongoing.

### A.    Seizure of Close to 1000 pounds of marijuana on March 2 and 3, 2005

66.    On Thursday, February 17, 2005, a search of trash was conducted at 82 Ashburnham State Road, Westminster, Massachusetts, residence of JUAN ARTEAGA. Two black trash bags and the contents of a "Rubbermaid" trash barrel were secured from the curb in front of the residence and searched. During the trash pull, officers recovered 11 plastic wrappers with numbers written with black magic marker on the exterior of the wrapper and several fabric softener sheets. Officers also recovered several pieces of paper with what appeared to be names, numbers

35

and calculations written on them. Officers also recovered an Airport luggage claim tag with the name, "ARTEAGA, JUAN" on it. Based upon my training and experience the items recovered from the trash search were consistent with narcotics packaging materials and drug records and or ledgers.

67.     In the days leading up to and including March 2, 2005, JUAN ARTEAGA was intercepted via Target Telephone 4 in conversation with GILBERTO discussing the purchase and transportation of a load of narcotics. On February 21, 2005, GILBERTO called JUAN ARTEAGA. GILBERTO told him to bring them if they front them. JUAN ARTEAGA responded that they were going to ask him how were things and how did he see things. Later in the conversation, JUAN ARTEAGA said that there were big percentages there. GILBERTO responded to JUAN ARTEAGA that if he had an opportunity like that, he would call the next day and give him the same offer he was saying so there are no discrepancies. JUAN ARTEAGA agreed and they agreed to talk later. Based upon the investigation to date, and my training and experience, I believe that during this conversation, GILBERTO and JUAN ARTEAGA were discussing the purchase of a load of narcotics to be transported to the Morfin DTO by JUAN ARTEAGA. I believe further that after this discussion, GILBERTO and JUAN ARTEAGA agreed to move forward with the purchase and future transport of the load of narcotics.

68. On February 22, 2005, beginning at approximately 8:06 p.m., GILBERTO again spoke to JUAN ARTEAGA. During this conversation, GILBERTO and JUAN ARTEAGA continued to discuss the details revolving around the purchase and transportation of the load of narcotics being arranged by the Morfin DTO. JUAN ARTEAGA asked if it was enough with all those guys or is there was any hope for him getting some help. GILBERTO replied that he was going to finish the following week for sure. JUAN ARTEAGA asked whether he could do anything for the weekend. After discussing some numbers, GILBERTO responded that it was getting good and things were going to start to move well, working hard. JUAN ARTEAGA replied that he was going to make a commitment here and that he "work hard yourself there" and "try to collect as much as you can man." That if he was going to have in your hands as much as you can, then he would

36

respect the offer of his namesake (JUANITO). JUAN ARTEAGA suggested that GILBERTO "try with that fucking white guy there too"  GILBERTO responded that  things were looking good. JUAN then asked GILBERTO if he could arrange for "three hundred" around there? The call then disconnected. Based upon the investigation to date, there is probable cause to believe that during this conversation that they were discussing the collection of outstanding drug debts to pay for the purchase of this upcoming load of narcotics.

69.    During a subsequent call placed by GILBERTO to JUAN ARTEAGA at approximately 8:19 p.m., JUAN ARTEAGA asked GILBERTO about his calculations because he had told him 110 here, but it came out to 109, and aside from that, in one of the little packages it was supposedly one and only three came out. JUAN ARTEAGA then advised GILBERTO to be careful with that there, because "that happens to me and it was not a problem, but he did not want that to happen to him with those people on the other side." Later in the conversation GILBERTO said that the problem was not with him because he and my buddy "measured them" one by one before they were sent over there. JUAN ARTEAGA assured GILBERTO that it was not a big deal, but asked him to keep an eye on that and he needed that (meaning confirmation of the number)  from GILBERTO because he did not want anyone pointing fingers to him and saying that he was a liar. GILBERTO confirmed that he had sent that complete because he had measured them well and had counted everything and every little bit was sent back. Based upon the investigation to date, I believe that during this conversation, GILBERTO and JUAN ARTEAGA were discussing a discrepancy in an amount of money sent to JUAN ARTEAGA by GILBERTO for the purchase of narcotics. I also believe that when they said 109 and 110, they were referring to $109,000.00 and $110,000.00 dollars. Also, when JUAN that he did not want any problem with "those people on the other side," he was referring to the money being transferred to an unknown Mexican source of supply for the narcotics.

70.    On February 24, 2005, at approximately 6:30 p.m., GILBERTO received a call from JUAN ARTEAGA.  During the call, GILBERTO and JUAN ARTEAGA discussed the

37

collection of "50" from JERRY HUNTER and another "50" from JUANITO. When GILBERTO asked JUAN ARTEAGA what he was doing, he responded that he was taking care of some details and when he was done, he would head over there in two or three days. Based upon the investigation to date, I believe that during this conversation, GILBERTO and JUAN ARTEAGA continued to discuss the collection of drug debts owed to the Morfin DTO. I also believe that in this conversation JUAN ARTEAGA was referring to reviewing the final preparations before transporting the load of narcotics to this area for the Morfin DTO.

71. On February 26, 2005, at approximately 11:28 a.m., GILBERTO received an incoming call from JUAN ARTEAGA in which JUAN ARTEAGA asked for money. JUAN ARTEAGA then provided GILBERTO with a Bank of America account number under the name Jorge Martinez and asked for $700.00 dollars to be sent. During the continued conversation, JUAN ARTEAGA told GILBERTO that he needed one-thousand. Based upon intercepted conversations, I believe that during this call, JUAN ARTEAGA was asking GILBERTO to send between $700.00 and $1,000.00 dollars to JUAN to cover expenses for the transportation of a load of narcotics for the Morfin DTO.

72. On February 28, 2005, at approximately 12:45 p.m., GILBERTO received an incoming call on Target Telephone 4 from JUAN ARTEAGA who told him that he needed some things there and how do they go about it. JUAN ARTEAGA asked if it was ready there to take back over there or how were things. GILBERTO explained that he needed a little more time. GILBERTO further stated that he was going to see "Negro" (meaning HUNTER) later. JUAN ARTEAGA told GILBERTO to hurry up because they were getting closer to over there and that needed something because he wanted to make some small payments around there. JUAN ARTEAGA then asked GILBERTO to see what he could do. Based upon the investigation to date, I believe that GILBERTO and JUAN ARTEAGA were talking about amassing money for JUAN ARTEAGA to pay for costs associated with the transportation of a load of narcotics discussed above. During the foregoing call, JUAN ARTEAGA also reminded GILBERTO that he needed 1.5 on that. I believe

38

that when GILBERTO and JUAN ARTEAGA were discussing the 1.5, they meant that JUAN ARTEAGA needed a $150,000 payment from a previous narcotics load.

73. Later that day, GILBERTO received another incoming call on Target Telephone 4 from JUAN ARTEAGA. JUAN ARTEAGA told GILBERTO to complete only one and a half. JUAN further stated that because that was what they were asking for, that they were going to go there to pick it up and once there they would work the figures. JUAN ARTEAGA also said to "just make sure to complete what they are asking for and no problem." GILBERTO replied that was better, since it was like 1-8-0, something like that. JUAN ARTEAGA added that it was fine because he knew that the other friend was coming and he would have to turn over to him right away. JUAN ARTEAGA told GILBERTO to "do the best you ... the one and a half are needed immediately and the rest they could see what they could do in the following days." JUAN then asked GILBERTO when he wanted that the guy to go visit him. GILBERTO replied, right now if he wanted, at Gil's buddy's. JUAN ARTEAGA agreed. Approximately half an hour later, GILBERTO received another incoming call from JUAN ARTEAGA. GILBERTO told JUAN ARTEAGA to tell him to hurry up. JUAN ARTEAGA replied that he would tell the guy to head over there real quick. I believe that during this conversation, JUAN and GILBERTO were discussing having GILBERTO pay one of JUAN ARTEAGA's associates $150,000 and that JUAN ARTEAGA sent someone over to pick the money up from GILBERTO.

74. On March 1, 2005, at approximately 10:09 a.m., GILBERTO spoke to JUAN ARTEAGA. JUAN ARTEAGA asked GILBERTO about what to do. GILBERTO responded by referring to "the girls to sell." JUAN ARTEAGA indicated that he understood. During the course of the conversation, GILBERTO asked JUAN ARTEAGA where he was and JUAN ARTEAGA responded that he had just passed by the big city. Based upon intercepted conversations, I believe that when GILBERTO and JUAN ARTEAGA  said "girls," they were referring to narcotics. I further believe that when JUAN ARTEAGA said he just passed by the big city, he was referring to traveling past New York City while en route to deliver narcotics to Morfin DTO in Massachusetts.

75. At approximately 1:08 p.m., GILBERTO called JUAN ARTEAGA. JUAN ARTEAGA asked GILBERTO if and where they could meet and indicated that the purpose of the meeting was "just to see how the waters were around there, to see what's going on, what needs to be done." GILBERTO asked JUAN ARTEAGA where he was and he said he was already home. During this call, I believe when JUAN ARTEAGA said, "just to see how the waters were around there, to see what's going on, what needs to be done," he was asking GILBERTO whether or not he was prepared to receive delivery of the narcotics shipment arranged by JUAN ARTEAGA.

76. Approximately half an hour after this call, agents observed GILBERTO arrive and park at 82 Ashburnham State Road, JUAN ARTEAGA's residence. Agents also observed vehicles registered to MIGUEL ARTEAGA parked in the driveway there. GILBERTO remained inside the residence for approximately 1 hour before returning to his vehicle, departing the area and returning to his 45 Stephens Road, Leominster, Massachusetts residence. Based upon previously intercepted calls, I believe GILBERTO traveled to the 82 Ashburnham State Road to discuss the delivery of a load of narcotics transported to Massachusetts for the Morfin DTO.

77. On March 1, 2005, at approximately 6:45 p.m., agents observed a white van, Massachusetts registration 27VR50 (registered to Peter Lobo, 1221 Reed Rd., North Dartmouth, Massachusetts) arrive at 82 Ashburnham State Road, Westminster and park in front of the detached garage. At approximately the same time, agents observed a subject believed to be JUAN ARTEAGA arrive at the residence operating his vehicle and park in the driveway. Agents then observed JUAN ARTEAGA and the unknown operator of the white van enter the ARTEAGA residence. Shortly thereafter, agents observed several individuals shoveling out the area around the large detached garage located behind the residence.

78. The following day, on March 2, 2005, at approximately 11:15 a.m., surveillance agents observed a white Kenworth Tractor, WA Reg 93630PR pulling a Thermo King Trailer #419, arrive at and pull into the driveway at 82 Ashburnham State Road. Agents then observed three males unhooking the tractor from the trailer unit. The tractor unit was then moved

40

away from the trailer. (It should be noted that this same tractor and trailer were seen on surveillance parked in the driveway at the 615 Willard Street location, RIGOBERTO's residence, on December 15, 2004).

79.    At approximately 1:30 p.m., the tractor departed 82 Ashburnham State Road and was surveilled to Kelly's Truck Stop, Route 20, Shrewsbury, MA. The driver of the tractor was then picked up by JUAN ARTEAGA in a blue Honda. The Honda was then surveilled driving to the 62 Frankfort Street, another Morfin DTO stash location.

80.    During the afternoon of March 2, 2005, the white van was moved from the driveway of the residence and parked inside the detached garage located adjacent to the residence.

81.    At approximately 2:25 p.m., a series of calls took place between GILBERTO and JUAN ARTEAGA and they agreed to meet at GILBERTO's house. At approximately 3:00 p.m., a truck registered to JOSE CARDENAS arrived at 45 Stephens Road, GILBERTO's residence. Three males exited the truck and the three met with two other individuals in the driveway of 45 Stephens Road and they all then entered 45 Stephens Road. Several minutes before JOSE CARDENAS' vehicle arrived, RIGOBERTO arrived in his Envoy and entered 45 Stephens Road.

82.    At approximately 7:35 p.m., surveillance agents observed the lights inside the detached garage to be on, and the white van parked inside. At approximately 8:20 p.m., surveillance agents observed the lights of the garage get turned off. At approximately 8:30 p.m., agents observed the white van and ARTEAGA's Honda leave the residence and depart the area. The white van and Honda were surveilled to a McDonald's restaurant, Route 12, Fitchburg, Massachusetts where they parked. Agents observed a male exit the van and enter the McDonald's. Approximately 10 minutes later, agents observed a male return to the van and depart the area. A Jeep Grand Cherokee, Massachusetts registration TC18EP, was observed to be traveling with the van away from the area. Surveillance was maintained on the van as it traveled east on Route 2 and then south onto Route 495. A check of the Massachusetts registry files determined the Jeep to be registered to Lynn Levesque,

41

595 Sanford Rd., Westport, Massachusetts. Constant visual surveillance was maintained on the van during its entire route of travel.

83.    At approximately 9:45 p.m., a Massachusetts State Police trooper observed the vehicle traveling south on route 495 and conducted a stop of the vehicle for a routine traffic violation. A check of the Massachusetts registry files revealed the operator of the vehicle to be unlicensed. The operator, Juan Reyes Villa Gomez was subsequently arrested for operating without a license. During inventory, approximately fourteen bundles of marijuana were located inside the rear of the van. The operator, the vehicle and evidence were subsequently transported to the State Police Barracks in Grafton, secured and processed. The marijuana was determined to be approximately 467 pounds.

84.    During the early morning hours of March 3, 2005, a state search warrant was executed on 82 Ashburnham State Road, Westminster. During this search, approximately 531 pounds of marijuana, one 45 caliber, semi-automatic handgun, one 38-caliber revolver and ammunition were seized. Law enforcement officers arrested JUAN ARTEAGA and MIGUEL ARTEAGA and three other individuals who were in the residence at the time that search warrant was executed.

## V.    PROBABLE CAUSE FOR SEARCH WARRANTS FOR TARGET LOCATIONS

### DRUG TRAFFICKERS' USE OF RESIDENCES GENERALLY

85.    I have participated in the execution of numerous search warrants at the residences of drug-traffickers such as the targets of this investigation. Based upon my experience with the execution of these search warrants, my training and the training and experience of other law enforcement agents involved in this investigation, the following kinds of drug-related evidence have been recovered in the execution of such search warrants: controlled substances, including but not limited to marijuana and cocaine; paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors,

42

razor blades, plastic bags, bundling materials and heat-sealing devices; books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances; personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; cash, currency, and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property; documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and firearms and other dangerous weapons.

86.    In addition, during the course of such residential searches, I and other agents have also found items of personal property that tend to identify the persons in residence, occupancy, control, or ownership of the subject premises. Such identification evidence is typical of the articles people commonly maintain in their residences, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

87.    Based upon my training, experience, participation in other narcotics investigations, and extensive discussions with other law enforcement officers experienced in narcotics investigations, I understand the following:

a.    Narcotics traffickers often find it necessary to store large sums of cash received from the sale and distribution of controlled substances outside the normal banking system. Accordingly, narcotics traffickers frequently maintain large amounts of cash and other valuable assets in order to maintain and finance their ongoing business.

b. Narcotics traffickers frequently maintain books, records, receipts, notes, ledgers, airline tickets, money orders and other documents relating to the transportation, ordering, sale and

distribution of controlled substances and monetary instruments and other assets. Such documents are generally maintained where the narcotics traffickers have ready access to them, such as at their residences or other locations where they regularly conduct their narcotics business.[12]

c. It is common for significant narcotics traffickers to hide contraband, proceeds of drug sales, records of drug transactions, weapons, ammunition, caches of drugs, large amounts of currency, financial instruments, keys for safe deposit boxes and other items of value and/or proceeds of drug transactions and evidence of financial transactions relating to obtaining, transferring, hiding or spending large sums of money made from controlled substance trafficking activities in secure locations within residences for ready access and to conceal them from law enforcement authorities.

d. Narcotics traffickers commonly maintain addresses or telephone numbers in books or papers that reflect names, addresses, telephone numbers and/or paging numbers for their criminal associates. They also tend to maintain for long periods of time telephone billing records that

---

[12]It is clear that the Morfin DTO is (and have need to be) keeping track of the drug debt(s) owned to them and the drug debt(s) they owe to others. For example, on December 10 GILBERTO placed a call on Target Telephone 3 and spoke to MIGUEL ARTEAGA. During the conversation, MIGUEL ARTEAGA asked GILBERTO if "Gringo" or "Juancho" paid already. GILBERTO said they (Gringo and Juancho) asked him to give them some more time. MIGUEL ARTEAGA told GILBERTO he needed to meet with him to put some numbers together because he (MIGUEL ARTEAGA) thought they are going to end up on bad terms. GILBERTO responded that it would not happen because he has everything written down. Based upon interceptions and my experience and training, I believe "Gringo" and "Juancho" are narcotics customers of the Morfin DTO who owe the organization money. I believe further that during this call GILBERTO and MIGUEL ARTEAGA agreed to meet and discuss narcotics records and proceeds. For another example, on December 15, 2005, at approximately 5:38 p.m., GILBERTO was involved in a series of push-to-talk calls with MIGUEL ARTEAGA in which they discussed a possible meeting at a Fitchburg parking lot with "Gringo" (believed a narcotics customer of the Morfin DTO). GILBERTO advised MIGUEL ARTEAGA that he (the customer) could get a "century" if the guy wanted and to tell the guy (customer) that he would give him a super special and they would complete him with 100. They (GILBERTO and MIGUEL ARTEAGA) agreed. ARTEAGA then told GILBERTO to try to loosen "it" up more so that they look even. Agents believe that during this part of the conversation GILBERTO and MIGUEL ARTEAGA were discussing providing a customer with 100 pounds of marijuana at a discount price. As the call continued, MIGUEL ARTEAGA and GILBERTO discussed what agents believe is the outstanding balance owed by a customer for narcotics distributed to him by the Morfin DTO. ARTEAGA asked GILBERTO if he remembered what the pending number was with the dude. GILBERTO reminded ARTEAGA he should have written it down.

44

evidence the placing of large numbers of calls each month in connection with narcotics dealing.

e. To evade surveillance and law-enforcement tracking through Registry of Motor Vehicle Records, narcotics traffickers also frequently rent vehicles and maintain records of such rentals at their residences.

f. Narcotics traffickers usually keep paraphernalia for packaging, cutting, weighing and distributing controlled substances. These paraphernalia include but are not limited to scales, packing devices and packaging materials.

g. Narcotics traffickers maintain many associated apartments from which they conduct their business, such as mills or "stash" houses. Narcotics traffickers frequently maintain records and other documents that evidence rental or lease agreements for such apartments. These documents constitute evidence of the association of the various apartments, which, itself, is a tool of the narcotics conspiracy. Drug traffickers frequently maintain such records in their residences.

h. Narcotics traffickers frequently maintain the items described above inside safes, key-lock strong boxes, suitcases, containers, safe-deposit boxes and other instruments, which are further secured by combination and/or key locks of various kinds.

i. Narcotics traffickers frequently build "stash" places within their residences or other locations in order to store illicit narcotics substances as well as the items described above.

j. Unexplained wealth (and evidence of same) may be probative of illegal activity including but not limited trafficking in controlled substances.

88.    Based upon all of the information I have obtained during the course of this investigation, and for the reasons more specifically set forth hereinafter, I believe that RIGOBERTO, GILBERTO, TEODORO and JOSE CARDENAS and HUNTER, like many drug traffickers, have used their residences in furtherance of their drug trafficking activities, and that evidence regarding those activities will be found in each of their residences.

## DRUG TRAFFICKERS' USE OF "STASH LOCATIONS" GENERALLY

89.    It has been my experience that drug traffickers use "stash locations" for their

45

drugs, in order to avoid keeping large quantities of the drugs in their residences. Stash locations also provide some measure of security for drug traffickers, who are concerned about being robbed. Stash locations provide privacy so that traffickers can break down and package the drugs, often with assistance from associates, at a location away from their homes and families. A stash location also provides some anonymity for the delivery of bulk drugs; in this way, a drug trafficker can receive a shipment of drugs without letting the courier (or other members of the supply organization) know where he or she lives.

90. As was the case with 82 Ashburnham State Road location from which a quantity of marijuana was seized on March 3, 2005, a residence may be primarily used as a stash location and for no other (or other limited) purpose. During the execution of the search warrant at the 82 Ashburnham State Road location, other law enforcement officers and I observed that the residence was furnished only with mattresses and minimal furnishings. It was clear that the location was being maintained for the purpose of stashing and packaging narcotics.

## THE TARGET LOCATIONS

### 615 Willard Street, Leominster, Massachusetts

91. RIGOBERTO, one of the leader of the Morfin DTO, resides at this location. Surveillance has been conducted at this location (via law enforcement agents and via a pole camera installed there) throughout this investigation. Based upon the investigation to date, the 615 Willard Street location is used by RIGOBERTO to meet with drug associates and customers. This location is also believed to be a stash location and/or transfer point for drugs as illustrated by events in mid-December 2004. In an intercepted call on December 14, 2004 at approximately 4:11 p.m. between RIGOBERTO and GILBERTO, they indicate that the truck was going to go RIGOBERTO's way. The following morning, on December 15, 2004, at approximately 11:38 a.m., the same day, a white Kenworth Tractor, WA Reg 93630PR pulling a Thermo King Trailer #419 registered to Olga Nunez d/b/a "Dolphins Express" (the same unit that delivered marijuana to 82 Ashburnham State Road, Westminister in March 2005) was observed by surveillance agents parked in the driveway at the 615

46

Willard Street location. At approximately 11:58 a.m, agents observed the tractor in the driveway and that the garage door was open. Shortly thereafter, RIGOBERTO was observed driving back to this location and was later believed to have driven into the garage as the garage door was then observed closed. Later in the day, surveillance agents observe the trailer (minus tractor) still in the driveway of the 615 Willard Street location. This unit remained at the 615 Willard Street location overnight. The night of December 15th, around 5:25 p.m., JUANITO called GILBERTO. GILBERTO wanted to know what portion was JUANITO'S and which was not. JUANITO asked GILBERTO if he had looked at the ones in the "small closet." JUANITO explained that the "eight small packs" there belonged to Padrino. During the course of the call, they referred to a total of 257 (believed to be reference to 257 pounds of marijuana). The following day, December 16th at approximately 9:48 a.m. (TT3), GILBERTO asked TEODORO if he loaded the things for Michael (believed to be Miguel ARTEAGA). TEODORO replied that they had already done so that morning at 4 a.m. and GILBERTO congratulated him for a job well done.[13]

92.    As previously discussed above in detail, on December 19, 2004, surveillance agents observed several members of the Morfin DTO unload a spare tire and rim and bring it into RIGOBERTO's residence at the 615 Willard Street address. Based upon the interceptions and the related surveillance at the 615 Willard Street address, I believe the spare tire was loaded with U.S. currency and was stashed at RIGOBERTO's residence until it was later moved to the 341 Union Street location (for a brief time) and then stored at 42 Stephens Road, GILBERTO's residence before

---

[13]Other members of the Morfin DTO also appeared to be aware that a delivery of marijuana had been delivered in the tractor trailer parked at the 615 Willard Street location. For example, during a December 16, 2004 call at approximately 6:59 p.m., RIGOBERTO joked with MIGUEL ARTEAGA about a truck being stolen. He told ARTEAGA he was worried. ARTEAGA asked RIGOBERTO, why, did they steal the truck or what. RIGOBERTO responded, can you believe they stole the "burro" from the house. ARTEAGA said this was getting good now and asked if RIGOBERTO wasn't guarding it. They continued to joke about reporting the truck as stolen. Based upon interceptions and physical surveillance, I believe that when RIGOBERTO said "burro" he was referring to the tractor trailer unit (believed to contain a quantity of marijuana) parked in the driveway of 615 Willard Street at the time.

being loaded into the vehicle that OCTAVIANO and two others drove out of Massachusetts on December 30th (and from which $209,000 was subsequently seized).

93.    Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at 615 Willard Street, Leominster, Massachusetts presently contain the items set forth in Attachment B-1 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that RIGOBERTO keeps, among other things, drug proceeds and drug-related paraphernalia in this residence, as well as documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### 45 Stephens Road, Leominster, Massachusetts

94.    Surveillance has been conducted at this location (via law enforcement agents and via a pole camera installed there) throughout this investigation. GILBERTO's 45 Stephens Road residence has been used for several drug-related purposes. First, GILBERTO and/or his associates have left from this location to deliver drugs and/or collect drug proceeds from customers. For example, on October 29, 2004, a person (later identified as Angel Feliz) asked GILBERTO to set aside "ten pieces" of the ones he usually takes instead of five (pieces). FELIZ also said that he was going to get a couple of receipts. GILBERTO agreed that he would be ready when FELIZ had done that and the two later made arrangements to have the delivery made. The following day, at approximately 10:26 a.m., an intercepted call indicated that TEODORO was going to get the things ready and that GILBERTO would wait for him at home. TEODORO indicated that he was on his way. At approximately 10:48 a.m., surveillance observed a vehicle registered to GILBERTO leave the 45 Stephens Road location. Surveillance followed the vehicle (observing that GILBERTO was driving and that he was accompanied by two individuals, one of whom may have been TEODORO)

48

to H&H Auto Repair, Feliz's business. There, GILBERTO's vehicle met with several unidentified individuals. Based upon the interceptions and surveillance, there was probable cause to believe that Feliz ordered a quantity of drugs from GILBERTO, GILBERTO contacted TEODORO to get it ready and then, leaving from 45 Stephens Road, GILBERTO and others delivered the quantity to Feliz or someone on behalf of Feliz. At a minimum, this sequence illustrates that 45 Stephens Road is a meeting place for GILBERTO, his runner(s) and other drug associates. A more recent example of the use of 45 Stephens Road occurred on March 2, 2005, in the midst of the arrival of a load of marijuana to MIGUEL ARTEAGA for the Morfin DTO. That day, at approximately 3:00 p.m., a truck registered to JOSE CARDENAS arrived at 45 Stephens Road and three males exited the truck and the three met with two other individuals in the driveway and they all then entered 45 Stephens Road. Several minutes before JOSE CARDENAS' vehicle arrived, RIGOBERTO arrived in his Envoy and entered 45 Stephens Road as well. This surveillance and related interceptions indicated that key members of the Morfin DTO were meeting at 45 Stephens Road in regard to the ongoing drug trafficking business.

95.    Second, the 45 Stephens Road is also used as a stash location for items used for the facilitation of drug trafficking. As discussed in more detail above, a spare tire containing U.S. currency that was later seized from the December 30th was stored at 45 Stephens Road before it was loaded into the vehicle for transport.

96. That GILBERTO stashes drug proceeds at this location is also illustrated by more recent events. On February 28, 2005, GILBERTO received an incoming call on Target Telephone 4 from RIGOBERTO on Target Telephone 2. GILBERTO told RIGOBERTO that he would put it there to "Pichirila's" (believed to be JUAN ARTEAGA's location, 82 Ashburnham State Road) to save, hide it there too. RIGOBERTO asked if it would it be safer there. GILBERTO replied that it scared him "here" and mentioned that the previous day, there had been an ugly black car running around like three times. RIGOBERTO cautioned him to make sure that "they don't mix it with the other one" and to make sure he knew how much of that he had now altogether. GILBERTO replied

49

that he had two and one half. GILBERTO then said that he would take it there and would want them to hide it for there. RIGOBERTO then asked GILBERTO about the timing of taking it there and GILBERTO replied that, possibly, he would do so the following morning. Based upon the foregoing, I believe that GILBERTO was storing cash ($250,000) at his residence, 45 Stephens Road, but was nervous about keeping it there in light of observations about what he believed to be law enforcement vehicles ("an ugly black car") and, therefore, was planning to move the money to JUAN ARTEAGA's location at 82 Ashburnham State Road, Westminster, Massachusetts.

97.    Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at 45 Stephens Road, Leominster, Massachusetts presently contain the items set forth in Attachment B-2 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that GILBERTO keeps, among other things, drug proceeds and drug-related paraphernalia in this residence, as well as documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### 62 Frankfurt Street, Fitchburg, MA

98.    As mentioned above, TEODORO and JOSE CARDENAS now reside at and use the 62 Frankfort Street. It is believed that this location is used as a stash location for drugs and drug proceeds and that TEODORO and JOSE CARDENAS retrieve drugs from this location for delivery to customers at the direction of GILBERTO and/or stash cash that they receive from customers there. For example, on February 20, 2005, at approximately 11:51 a.m., GILBERTO (on Target Telephone 4) spoke to HUNTER. During this call, HUNTER stated that he immediately needed 30. GILBERTO asked HUNTER if he had money, to which HUNTER replied that he had 50 bucks. GILBERTO confirmed that HUNTER needed 30, then said he would call HUNTER in

20 minutes. At approximately 11:53 p.m., GILBERTO called JOSE CARDENAS and told him he (GILBERTO) needed 30 for HUNTER. After confirming when it was the 30 was needed, JOSE CARDENAS asked GILBERTO if he meant "the ugly ones or the pretty ones." GILBERTO instructed JOSE CARDENAS to provide the pretty ones, like the samples he gave him. JOSE CARDENAS acknowledged and said they would put it together. At approximately 12:04 p.m., GILBERTO received a call from JOSE CARDENAS who asked GILBERTO if he wanted 30, which GILBERTO confirmed. JOSE CARDENAS then told GILBERTO that "the guys were ready" (meaning a coded reference to the completed packaging of the narcotics). At approximately 12:22 p.m., GILBERTO called HUNTER and agreed to meet at the K-Mart in ten minutes. GILBERTO then called JOSE CARDENAS and instructed him to go to K-Mart to get the car. JOSE CARDENAS told GILBERTO he would go pick up the car (HUNTER's) and load up the girls (a coded reference to narcotics). Moments later, agents observed JOSE CARDENAS exit the 62 Frankfort Street location and enter his grey Ford Taurus. Agents observed as JOSE CARDENAS traveled to the parking lot of the K-Mart on South Street in Leominster. At approximately 12:35 p.m., agents observed HUNTER leave his residence at 30 North Main Parkway in Leominster, travel to the Shaw's on Route 12 in Leominster, and meet with FELKER. Agents observed as HUNTER and FELKER traveled in separate vehicles to the K-Mart and met with CARDENAS at approximately 12:50 p.m. Agents observed JOSE CARDENAS exit his vehicle in the parking lot of the K-Mart, where he entered the FELKER vehicle, which JOSE CARDENAS then drove alone directly to 62 Frankfort Street. A short time later, agents observed CARDENAS as he left 62 Frankfort Street in FELKER's vehicle and traveled back towards the K-Mart. At approximately 1:15 p.m., agents observed CARDENAS park the FELKER vehicle and then leave the area in his own vehicle. Agents surveilled JOSE CARDENAS as he traveled back to 62 Frankfort Street in his own vehicle. Agents then observed HUNTER and FELKER return to the K-Mart parking lot, where FELKER entered his vehicle and left the area. Agents then surveilled HUNTER as he traveled directly to his residence, 30 North Main Parkway, Leominster. At approximately 1:22 p.m.,

51

GILBERTO received a call from JOSE CARDENAS stating he was on his way to the house and that HUNTER had given him the documents (meaning money). GILBERTO then called HUNTER and asked what "the paper" HUNTER had sent with JOSE CARDENAS was for. HUNTER replied 50, and GILBERTO asked if it was for what HUNTER took today. HUNTER replied no, that it was for the old one. GILBERTO then asked if it (the money) was for the last one, to which HUNTER agreed it was. Based upon intercepted conversations, physical surveillance and experience, agents believe that JOSE CARDENAS (at the direction of GILBERTO) distributed approximately 30 pounds of marijuana to HUNTER and FELKER (by loading up the FELKER vehicle at 62 Frankfort Street and returning to the K-Mart parking lot where FELKER then retrieved it) and that HUNTER provided CARDENAS with approximately $50,000.00.

99.     Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at 62 Frankfort Street, Fitchburg, Massachusetts presently contain the items set forth in Attachment B-3 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that TEODORO CARDENAS and JOSE CARDENAS keep, among other things, drugs, drug proceeds in this residence, as well as documentary evidence reflecting past and present narcotics transactions between and among the other targets of this investigation.

### 341 Union Street, 2nd Floor and Garage, Leominster, MA

100.     The investigation to date reveals that the Morfin DTO has used the 341 Union Street location as a stash location at various points. Currently, this location is being used by TEODORO and JOSE CARDENAS, "runners" for the Morfin DTO. For example, at 11:10 a.m. on March 5, 2005, GILBERTO called an unknown male that GILBERTO identified as "Half Life." GILBERTO asked him if he could help out and connect the lights at the apartment. The unknown

52

male agreed. GILBERTO then provided him with a phone number and a location "341 Union Street." The unknown male confirmed that this location was in Leominster. GILBERTO advised the unknown male that it was the second floor and to do it today. (Agents understand this exchange to mean that the unknown male was going to get the power connected for the stash location on the second floor). On March 5, 2005 at 1:53 p.m., GILBERTO called HUNTER and they discussed the purchase of 14 pounds of marijuana. Then GILBERTO immediately called JOSE CARDENAS and asked him to go to the same place that he had gone to the previous night and give HUNTER 14 of the same kind (referring to 14 pounds). JOSE CARDENAS said that there was a problem because they took the scale there (meaning from the 62 Frankfort Street location to the 341 Union Street location). GILBERTO asked him what the heck were you thinking (meaning why would you move scale when there were still drugs, that would have to be weighed, at that location). JOSE CARDENAS responded that since all of the clothes already came out, they had taken it there (meaning since they had already transferred a stash of drugs from 62 Frankfort Street location to 341 Union Street and, therefore, had already moved the scale). GILBERTO then told JOSE CARDENAS to come over here then, bring whatever's left and meet them there and then go there really quick at 2:15 p.m. (to meet HUNTER). JOSE CARDENAS said that he was on the way, but there was no light.

101.    After this call, at approximately 2:30 p.m., surveillance observed JOSE CARDENAS meet HUNTER in what is believed to be the delivery of fourteen pounds of marijuana at the Victoria Market, Rte. 13, Leominster. From this deal, JOSE CARDENAS returned to the 341 Union Street. At approx. 2:54 p.m., GILBERTO called JOSE CARDENAS. JOSE CARDENAS told GILBERTO that they were home and for GILBERTO to come over. GILBERTO asked "what home?" JOSE CARDENAS responded "here at the apartment." (During this period, JOSE CARDENAS's vehicle remained at 341 Union Street and he was not observed leaving this location). During subsequent conversation, GILBERTO told JOSE CARDENAS to keep good notes of what was taken and what was left.

102.    Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at the 341 Union Street location presently contain the items set forth in Attachment B-4 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that TEODORO and JOSE CARDENAS keep, among other things, drugs and drug-related paraphernalia, drug proceeds in this residence, as well as documentary evidence reflecting past and present narcotics transactions between and among the other Target Subjects and associates of the Morphin DTO.

### 30 North Main Parkway, Leominster, MA

103.    On numerous occasions, surveillance has observed HUNTER leaving from or returning to his residence, the 30 North Main Parkway location, when he was going to be meeting with members of the Morfin DTO to deliver money for drugs or receive drugs. For one example, before the February 20, 2005 meeting (after HUNTER's order of 14 pounds of marijuana from GILBERTO) between HUNTER, FELKER and JOSE CARDENAS described above, HUNTER was observed leaving from the 30 North Main Parkway and meeting with FELKER before driving to the K-Mart location to meet with CARDENAS. After JOSE CARDENAS returned with FELKER's vehicle, surveillance agents observed HUNTER and FELKER depart separately in their vehicles; HUNTER was observed returning to 30 North Main Parkway. Based upon prior and subsequent interceptions, it is believed that HUNTER, traveling from the 30 North Main Parkway location, delivered money for marijuana to JOSE CARDENAS for delivery to GILBERTO and that HUNTER must have brought same money from his residence to JOSE CARDENAS.

104.    For another example, on January 25, 2005 at approximately 5:06 p.m., HUNTER asked GILBERTO to give him a picture (sample) of the "350" (believed to be a reference to drugs). GILBERTO agreed and they agreed to meet at the bookstore. GILBERTO said that he

was going to send him another "800" (believed to be a reference to drugs). HUNTER said that he wanted both (meaning he wanted samples of both the "350" and "800" drugs). GILBERTO then called TEODORO and told him to meet HUNTER outside of T.J. Maxx. At approximately 5:25 p.m., surveillance set up on the T.J. Maxx store located at the Water Town Plaza, Leominster observed HUNTER enter the store. At approximately 5:44 p.m., agents observed a 1992 blue Honda Accord registered to MIGUEL ARTEAGA park in the Office Max parking lot near the T.J. Maxx store with two occupants. Agents observed the passenger to be TEODORO CARDENAS. A few minutes later, HUNTER exited the store, got into a grey sedan parked in the T.J. Maxx parking lot and drove into the Office Max parking lot next to (window to window) the Honda occupied by TEODORO and another male. At approximately 5:53 p.m., HUNTER drove away from the lot and back to his residence at 30 North Main Parkway. On this occasion, there is probable cause to believe that HUNTER ordered a sample of drugs from GILBERTO and, having received same from TEODORO, returned to the 30 North Main Parkway location.

105.    Based upon the foregoing, and based upon my training and experience, I submit that there is probable cause to believe that the premises located at 30 North Main Parkway, Leominster, Massachusetts presently contain the items set forth in Attachment B-6 that is attached hereto and incorporated herein, and that those items constitute evidence of the commission of a criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846. In particular, I believe that HUNTER keeps, among other things, drugs and drug-related paraphernalia, drug proceeds as well as documentary evidence reflecting past and present narcotics transactions at this location.

## VI. CONCLUSION

106.    Based on all the foregoing, I submit there is probable cause to believe the Target Subjects have conspired with each other and known and unknown persons to possess with intent to distribute and to distribute marijuana, a Schedule I controlled substance, and cocaine, a

Schedule II controlled substance, in violation of 21 U.S.C. §846 and that evidence of the commission of this criminal offense, contraband, the fruits of crime, things otherwise criminally possessed, and property designed or intended for use or which is or has been used as the means of committing a criminal offense, specifically, a violation of 21 U.S.C. §846, will be found at the Target Locations.

Dated this  day of March 12, 2005.

Jamie P. Vitale
Task Force Officer
Drug Enforcement Administration

Sworn to and subscribed to before me in Boston, Massachusetts, this 12th day of March 2005.

ROBERT B. COLLINGS
UNITED STATES MAGISTRATE JUDGE

56

**Attachment A-1**
**615 Willard Street, Leominster, Massachusetts**

**Premises to be Searched**

615 Willard Street in Leominster is a tan-colored, wood-framed two story residence with green shutters. It is located at the corner of Willard Street and Harbor Light Estates. The numbers 615 are affixed to a mailbox located at the end of the driveway. The front door of the residence is tan in color with a green storm door and faces Willard Street. It is accessed from a porch attached to the front of the residence which is reached by climbing a set of wooden stairs attached to the right side of the porch. A tan colored, wood-framed multi bay detached garage with green doors and shutters is positioned at the end of the driveway and adjacent to the rear of the residence. A photograph of 615 Willard Street, Leominster, Massachusetts is attached.



**615 Willard Street
Leominster, MA**

**Attachment B-1**
**615 Willard Street, Leominster, MA**

**Items to Be Seized**

1.    Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

2.    Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

3.    Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

4.    Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

5.    Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

6.    Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

**Attachment A-2**
**45 Stephens Road, Leominster, Massachusetts**

**Premises to be Searched**

45 Stephens Road in Leominster is a white-colored, wood-framed one story residence with pale red shutters. The numbers 45 are black and affixed to the left of the front door. The front door of the residence is off-white in color with a white storm door and faces Stephens Road. It is accessed by climbing a set of concrete steps attached to the front of the residence. A wood frame open carport is attached to the left side of the residence. There is access to the residence from the carport via a side door atop a set of concrete steps. There are several small sheds and a portable garage located in the back yard of the residence adjacent to the in-ground pool. A photograph is attached.



**45 Stephens Road
Leominster, MA**

**Attachment B-2**
**45 Stephens Road, Leominster, Massachusetts**

**Items to Be Seized**

1.  Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

2.  Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

3.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

4.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

5.  Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

6.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

**Attachment A-3**
**62 Frankfurt Street, Fitchburg, MA**

**Premises to be Searched**

    62 Frankfort Street in Fitchburg, Massachusetts is a blue-colored, wood framed two story residence with white shutters. The numbers 62 are affixed to a mail box, attached to a chain linked fence gate in front of the residence. The front door is white in color with a white storm door and faces Frankfort Street. It is accessed by climbing two sets of concrete steps at the end of a short walkway. A photograph is attached.



**62 Frankfurt Street**
**Fitchburg, MA**

**Attachment B-3**
**62 Frankfurt Street, Fitchburg, MA**

**Items to be Seized**

1.   Controlled substances including marijuana and cocaine;

2.   Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

3.   Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

4.   Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

5.   Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

6.   Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

7.   Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

**Attachment A-4**
**341 Union Street, 2nd Floor and Garage, Leominster, MA**

### Premises to Be Searched

341 Union Street, 2nd Floor, Leominster, Massachusetts is a white-colored, wood framed multi-family, two story residence. It is located at the corner of Union Street and Avon Street in Leominster, Massachusetts. There is a single set of purple shutters on the window at the bottom of an exterior staircase which is located on the left side of the residence. The second floor door is white in color with a storm door. It can be accessed by climbing a set of wooden stairs attached to the left side of the residence. A wood framed garage is attached to the left side of the residence. A photograph is attached..



**341 Union Street, 2nd Floor
Leominster, MA**

**Attachment B-4**
**341 Union Street, 2nd Floor and Garage, Leominster, MA**

**Items to be Seized**

1.  Controlled substances including marijuana and cocaine;

2.  Paraphernalia for packaging, processing, diluting, weighing, and distributing controlled substances, such as scales, funnels, sifters, grinders, glass panes and mirrors, razor blades, plastic bags, bundling materials and heat-sealing devices;

3.  Cash, U.S. currency; books and papers reflecting debts and collections relating to monies owed or due for the distribution of controlled substances; and records relating to controlled substances income and expenditures of money and wealth, such as money orders, wire transfers, cashier's checks and receipts, bank statements, passbooks, checkbooks, and check registers, safety deposit keys and deeds to real property;

4.  Books, records, receipts, notes, ledgers, and other papers relating to the distribution of controlled substances;

5.  Personal books and papers reflecting names, addresses, telephone numbers, and other contact or identification data relating to the distribution of controlled substances;

6.  Documents indicating travel in interstate and foreign commerce such as travel itineraries, plane tickets, boarding passes, motel and hotel receipts, passports and visas, credit card receipts, and telephone bills; and

7.  Items of personal property that tend to identify the person(s) in residence, occupancy, control, or ownership of the Target Location including but not limited to canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, and keys.

**Attachment A-5**
**30 North Main Parkway, Apartment 1 West, Leominster, Massachusetts**

<u>**Premises to be Searched**</u>

30 North Main Parkway, Apartment 1 West, Leominster, Massachusetts is a white-colored, three- story, multi-family dwelling with black shutters. The lower half of the building is red brick. The numbers "30" are black and affixed to the awning above the front door of the building. The front door of the building is a steel framed glass door which leads to a second steel framed glass door inside a common entryway. It is accessed from a set of brick and concrete steps leading up from a common driveway to the front of the building. There is a three bay attached garage located to the left front of the building. Entering from the front entrance, Apartment 1 West is located to the right of the entrance. A photograph of 30 North Main Parkway, Leominster is attached).